M & W GEAR COMPANY, Plaintiff-Appellee and Cross-Appellant, *v.* AW DYNAMOMETER, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

Fourth District   No. 16663

Opinion filed July 17, 1981.—Rehearing denied August 7, 1981.

WEBBER, J., dissenting.

Edward J. Kionka, of Columbia, and Roger B. Gomien, of Gomien, Masching & Neville, Ltd., of Dwight, for appellants.

William R. Brandt, of Bloomington, for appellee.

Mr. JUSTICE MILLS delivered the opinion of the court:

False and misleading advertising.

Jury verdict and an injunction for the injured plaintiff.

We affirm.

M & W Gear Company filed suit against the defendants, AW Dynamometer, Inc., and Fred L. Friend, alleging that defendants intentionally and maliciously made false and misleading representations as to plaintiff's product in published advertisements. Plaintiff prayed for compensatory and punitive damages as well as an injunction and attorney's fees.

Following a jury trial, plaintiff was awarded the sum of $45,750. The trial court entered judgment, finding that plaintiff was entitled to injunctive relief and ordered the defendants to be permanently enjoined from disparaging in any manner, and by any false or misleading representation of fact, the dynamometers manufactured by the plaintiff. The court also found that the plaintiff was entitled to reasonable attorney's fees and ordered the defendants to pay $23,046 in fees to the plaintiff.

Defendants filed a notice of appeal from the trial court's judgment order. Plaintiff cross-appeals for remandment of the cause to the trial court for a determination and allowance of the reasonable attorney's fees and costs the plaintiff has incurred in the course of this appeal.

## FACTS

The evidence produced at trial indicated that plaintiff and defendants were the major manufacturers of agricultural dynamometers in the United States. In 1976, defendants published an advertisement in the *Implement and Tractor* magazine. The magazine had a circulation at the time of approximately 16,000 and was primarily sold to agricultural equipment dealers. Most, if not all, agricultural dynamometers are sold to dealers of farm equipment, rather than to farmers. In 1977, defendants started advertising in a second publication, *Farm and Power Implement*. This publication was also circulated to farm equipment dealers and had circulation comparable to *Implement and Tractor*. Reprints of the advertisements were carried by defendants' manufacturer representatives to be displayed in shows and to be used as handout literature to prospective customers. The advertisements were admitted as plaintiff's exhibit Nos. 1 and 2, and were as follows:

Defendant Fred Friend, sales manager for defendant AW, stated that the references to "competition" and "twin oil pump" were intended to refer to plaintiff M & W's dynamometers. He further stated that the diagram used in the advertisement for comparative purposes and labeled as "gearbox and oil pump" was intended to make the reader identify with the M & W dynamometer. Friend stated that he was never personally involved in a steam explosion with an M & W dynamometer although he had witnessed the aftermath of such an explosion on two occasions. He

stated he had no way of knowing, however, whether the dynamometers he had observed after the explosion were being operated in accordance with the procedure manuals of M & W at the time of the explosion.

Friend admitted that plaintiff's exhibit No. 1 implied that M & W's dynamometer overheated in only three to five minutes at 50% of its

**$3225** COMPLETE

Your In Shop Operational Cost.

**$3600** *+

AW Model 375

No Oil Required

PLAINTIFF'S EXHIBIT 2

Gearbox & Oil Pump

## "There is a Difference between a Dynamometer and a Loading Device."

### Meters Measure!

When you're looking for an accurate measurement, choose the tool designed for the job — a true dynamometer, not just an expensive loading device. Here's how you can tell the difference!

| | AW Dynamometer | Loading Device |
|---|---|---|
| Does it measure horsepower? | Yes | No |
| Does it guarantee *Any* degree of accuracy? | Yes—98% | No |
| Does it meet OSHA noise limitations of 115 Db? | Yes | No— Unit tested by AW was in excess of the 115 Db maximum |
| Does it have automatic safety device that prevents overheating and thermal explosion? | Yes | No |
| Does it give direct HP readings at all rpm — without slide rules or conversion charts? | Yes | No |
| Does it give torque readings or allow torque rise adjustments? | Yes | No |
| Are all gauges and controls portable for truly one man readout and operation? | Yes | No |
| Can shop personnel verify and simply calibrate test equipment? | Yes | No |

**The AW Challenge:**
We'll demonstrate our dynamometer against any competitive agricultural dynamometer in your shop. Just call us collect at (309) 723-2021 and we'll be there so you can decide for yourself. You'll see why 5 major tractor manufacturers recommend AW for the dealers.

*Based upon current list prices of both machines. Delivered ($75.00 average freight) and ready to operate ($150.00 for hydraulic oil and tires is not included in base price)

**AW DYNAMOMETER, INC.**
COLFAX, ILLINOIS 61728

advertised capacity. He stated he obtained this figure from a piece of paper that he carried around relating to a demonstration in which two large tractors were put side by side with two dynamometers, one an AW and the other an M & W P-2000. He made no memoranda concerning the observations of M & W's overheating but rather that information in the advertisement was the result of his observation of comparative demonstrations conducted over a period of a year to 1½ years.

Friend stated that the maximum noise level permitted in any shop under OSHA regulations was 115 decibels. This figure applied to the maximum level for the entire shop and not solely to the maximum for agricultural dynamometers. Friend further testified that he determined that M & W's dynamometer was in violation of OSHA regulations through an experiment involving a used M & W P-2000 model. The dynamometer was tested in an isolated room, and he observed readings in excess of 115 decibels. He did not know if the meter used to measure the sound was an official meter for OSHA or an approved meter or anything of that nature.

Arthur Warsaw, the owner of AW Dynamometer, stated that he executed the final approval of the advertisements represented in plaintiff's exhibit Nos. 1 and 2 and that it was an attempt to effect the comparison between the AW dynamometer and the M & W dynamometer. The claim in the advertisement that AW dynamometers met OSHA level of 115 decibels was based upon his own observation, and he had no statement from OSHA to that effect nor did he ever ask the personnel of OSHA to make an inspection of the machine.

In making the claim that the M & W dynamometer was 150 to 200 horsepower short of the advertised capacity, Warsaw depended upon information supplied to him orally from people in the field. Warsaw stated that in 1975 both the AW and M & W machines were designed to be operated at a maximum temperature of 180 or 190 degrees. If the machines were operated in that temperature range, as instructed in the manuals, there would be no steam explosion hazard.

In addition to plaintiff's exhibits Nos. 1 and 2, defendants presented to the court a list compiled from information received from manufacturer representatives who had been traveling throughout the United States. The list was prepared by the defendants and handed out to defendants' sales personnel. It was exhibited to potential dynamometer customers and represented people who had difficulties with M & W explosions, burnups, upsets, pumpouts, and "you name it." It was to be shown to prospective purchasers who questioned the sales personnel as to why they should not buy an M & W dynamometer. The sales personnel were instructed to have the purchaser call the people on the list and verify that the people did have trouble with M & W dynamometers. Friend stated that the category "you name it" didn't really mean anything and was meaningless.

Friend stated that in his opinion the statements made in the advertisements and in the list would not mislead potential purchasers as to the qualities and character of the M & W dynamometer, although he did state that he felt it would be his responsibility to advise the person that accidents occurred either by design or human failure.

Warsaw stated that in preparing the list he intended to provide information to the customers as to exactly what the customer was buying and what he could anticipate in the way of performance. It was also very possible that it was his intention that any potential customer would have to concern himself that he might be hurt or people might be hurt if they bought an M & W dynamometer. Of the 13 persons on the list, Warsaw stated he contacted 3.

Defendants presented the testimony of one person whose name appeared on the list. It was the testimony of that person that the M & W P-400A dynamometer had caught fire. He stated, however, that although the dynamometer was hooked up to a water hose which was to supply the coolant, one tire of a tractor was on the hose.

The vice president in charge of finance for the plaintiff M & W Gear, Harry Rakers, stated that his department was responsible for all of the accounting of the company. He further stated that he determined sales and revenue projections for the years 1976-1979. He did these projections by examining the percentage of sales to the number of distributors and dealers. Additionally, he looked at the history of the marketability of the various sizes of dynamometers.

On cross-examination, Rakers stated that his company projected the profit on each product line and that on occasion the projections were wrong. He further stated that a decline in sales was sometimes due to market saturation or because the products became obsolete or the company's research and development didn't keep up with the demands of the market. Furthermore, he stated that a decline sometimes occurs because the engineering and marketing priorities are directed toward different products as opposed to concentrating on a particular product where there has been emphasis in an earlier year. He stated that he knew of no particular client who failed to buy an M & W dynamometer because of the advertising done by the defendants. He did state, however, that in developing the projections, factors such as market obsolescence, product priorities, *etc.*, would be taken into account.

Glenn Bloomquist, a professor of economics at Illinois State University, stated he used the figures supplied by M & W through Harry Rakers, concerning the sales of M & W and AW for a period of time. Bloomquist found that there was a general pattern of agricultural dynamometer sales and that from 1971 through 1976 M & W sales paralleled the national farm machinery sales. In 1976, there was a downward trend in the total value of

the manufacture and shipments of farm machinery and equipment of less than 1 percent. In that same year, M & W had a decline of almost 13 percent. In contrast, AW Dynamometer had a large increase. Specifically, AW had an increased sales of 130 units, while M & W had a decrease of 140 units. Using the projections supplied by Rakers, Bloomquist estimated that if M & W sales had not dropped at all during 1976, it would have realized an additional net profit of $88,500.

On cross-examination, Bloomquist stated that an increase of the sales staff of AW from 9 to 16 or 17 during this period could have been a significant factor, particularly when only two companies operated in the market.

## Lost Profits

Defendants' initial argument is that the plaintiff's evidence was insufficient to support recovery since it was speculative and was provided by an interested witness. Defendants place a heavy reliance on the decision in *Salaban v. East St. Louis & Interurban Water Co.* (1936), 284 Ill. App. 358, 1 N.E.2d 731. In *Salaban*, the plaintiff was a restaurant and rooming house keeper. He brought an action for damages against the defendant for defendant's failure and refusal to supply him with water. The trial court directed a verdict for the defendant and the plaintiff appealed. On appeal, the court found that the damages sought were of a highly speculative character and that no foundation had been laid in the record. The court stated that profits cannot be recovered as an element of damages where they are speculative, contingent, or uncertain. Where the profits claimed are merely speculative or remote, or not capable of being correctly ascertained under the recognized rules of evidence, they have been invariably denied by the court. In particular, the plaintiff in *Salaban* presented testimony showing only that he had made as much as $350 per month out of his business. The court found that this testimony, standing alone and uncorroborated by statements, exhibits or circumstances, was insufficient.

Defendants here argue that the plaintiff's proof of damages suffers from the same fatal defects as that of the plaintiff in *Salaban*. Defendants note that the damage testimony was supplied by the use of sales projections compared to actual sales. In particular, there was testimony indicating that a number of factors could have affected the sales in a market such as the one concerned here.

■■ Plaintiff responds by citing the decision in *Board of Education v. United States Fidelity & Guaranty Co.* (1969), 115 Ill. App. 2d 416, 253 N.E.2d 663, as stating the current rule on damages for lost profits. In that case, the court stated that a recovery may be had in a proper case for prospective profits where there are *any criteria* by which profits can be

estimated with reasonable certainty. The court noted that absolute certainty as to the amount of loss or damages in such cases may not, ordinarily, be obtainable. Such was not required, however, to justify recovery. All the law requires is that it be approximated by competent proof. The fact that proof of the exact amount of loss may be impossible does not justify refusing compensation. In cases of this character, all the law requires is that the evidence shall, with a fair degree of probability, tend to establish a basis for the assessment of damages. See also *Meyer v. Buckman* (1955), 7 Ill. App. 2d 385, 129 N.E.2d 603.

As plaintiff correctly points out, the lost profits claimed to arise out of an exclusion from a market are customarily not susceptible to detailed or direct proof. Unless proof of an inferential character is permitted, the results would be to immunize a defendant from the consequences of his wrongful act. (*Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398.) *Ergo*, we hold that the testimony of Rakers and Bloomquist was sufficient to support a jury finding of plaintiff's lost profits.

Defendants further argue that the damage evidence presented by Rakers and Bloomquist must be disregarded. In particular, defendants claim that for some time now the Illinois courts have recognized that an estimate of profits by an interested witness does not constitute such evidence as will support a judgment for damages.

In *Podlaski v. Bender* (1909), 150 Ill. App. 312, the court examined the accuracy of testimony concerning lost profits. The court determined that mere conjecture by an interested witness would not support an award of lost profits. The headnote for the case, however, stated that an estimate of profits by an interested witness does not constitute evidence as will support a judgment for damages. The language of the headnote was picked up by the court in *Salaban* without recognition of the fact that it was a quote of a headnote. Later, the court in *Tonchen v. All-Steel Equipment, Inc.* (1973), 13 Ill. App. 3d 454, 300 N.E.2d 616, also cited the *Podlaski* headnote, although the court there noted it was quoting a headnote.

Given the interesting origin of this "longstanding" rule in Illinois, we must reject the defendants' argument. Clearly, the court in *Podlaski* was not setting down a rule whereby testimony of an interested witness as to lost profits must be totally disregarded. Rather, the court was finding that under the facts of that case, the testimony *only* of an interested witness was insufficient. Clearly, when one is determining lost profits, the testimony of some interested witness is essential as the basis for laying the foundation for past profit figures. Were defendants' argument taken to its logical extreme, the award of lost profits would be precluded in almost any case since an estimate of lost profits could only be obtained from

information possessed by an interested witness. Perhaps in recognition of this result, the court in *Board of Education v. United States Fidelity & Guaranty Co.* rejected a similar argument.

In their reply brief, the defendants further argue that the amount of loss was not causally connected to defendants' act. Defendants claim that no witness could or did testify that there was any relation between the actual sales of dynamometers and defendants' ad. Defendants contend that there were a variety of factors that would affect the market and since other factors could have caused the decline in sales, defendants argue that plaintiff has failed to meet its burden.

At trial, Rakers stated that a decline in sales was sometimes due to market saturation or because the products have become obsolete, the company's research and development doesn't keep up with the demands of the market, or because engineering and marketing priorities are directed towards different products. Rakers stated, however, that these factors were considered when his company made its forecast of sales for the years 1976 through 1979.

■■ We find that there has been sufficient evidence presented for the jury to conclude that there was a causal connection between the defendants' advertisements and the plaintiff's lost sales. Of particular importance is the fact that the decline in plaintiff's sales paralleled the appearance of the publications.

### MISLEADING

■■ Defendants next argue that the plaintiff presented insufficient proof that the advertisements in question were misleading so as to allow submission of the question to the jury. Initially, defendants argue—without citation to authority—that the question of whether the advertisements were misleading could justifiably be considered only from the viewpoint of the persons to whom the statements were directed. As defendants frame the question, it is not whether a layperson would have been misled by the statements but whether those persons most likely to purchase the items would be misled. Defendants assert that the advertisements in almost any technical publication would mislead or confuse all persons, except those familiar with the area.

But—defendants have failed to point out what special knowledge an agricultural implement dealer would have concerning the products in question which would prevent him from being misled by the advertisements. As the plaintiff correctly argues, by printing half truths, defendants were telling the prospective customers of the plaintiff that if they bought plaintiff's machine, they were likely to get hurt. For instance, one advertisement stated that defendants' dynamometer did not create a steam explosion hazard. While the evidence presented does show that

some of plaintiff's dynamometers did explode, there was no evidence that they exploded when they were being properly used. Also, both printed advertisements refer to plaintiff's unit as being in excess of OSHA noise limitations of 115 decibels. In fact, there was no OSHA limitation for dynamometers. Furthermore, it appears as if OSHA limitations apply only in graduated degrees. For instance, a shop with a noise level of 115 decibels is so loud that workers, under OSHA regulations, were only permitted to work for a certain amount of time. The lower the noise level, the longer the workers were permitted to work.

The hub of defendants' argument is that the plaintiff totally failed to prove that the statements were false and thus they must be taken as true. As such, defendants question how statements which must be taken as true could be found misleading when addressed to persons knowledgeable about the technical aspects of the product.

The fundamental flaw in defendants' argument, of course, is that a statement which is not proven false must be considered true and therefore not actionable. There is, however, a distinction between a *false* and a *misleading* statement. A misleading statement could be true in fact, but may be designed so that the reader obtains a false impression from the statement. From a complete examination of the advertisements and the list distributed by the defendants, the jury could have properly concluded that the statements made in the advertisements were in fact misleading.

## Public Injury

Defendants next allege that the plaintiff has failed to prove an essential element of his cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1979, ch. 121½, par. 262).

Section 10a(a) of the Consumer Fraud and Deceptive Business Practices Act provides:

"(a) Any person who suffers damage as a result of the violation of Sections 2 through 2N of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper." (Ill. Rev. Stat. 1979, ch. 121½, par. 270a(a).)

Section 2 of the Act:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade

Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. *In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."* (Emphasis added.) Ill. Rev. Stat. 1979, ch. 121½, par. 262.

Defendants now argue that under the above-quoted sections, plaintiff was required to allege and prove that defendants' conduct had an adverse effect on the public. As support, defendants cite the decision in *Evanston Motor Co. v. Mid-Southern Toyota Distributors, Inc.* (N.D. Ill. 1977), 436 F. Supp. 1370, where that court was faced with an action under section 2. Relying upon the decision in *Fitzgerald v. Chicago Title & Trust Co.* (1977), 46 Ill. App. 3d 526, 361 N.E.2d 94, the *Evanston Motor Co.* court found that in the absence of Illinois precedent on the question, Illinois courts will construe section 2 *in para materia* with section 5a of the Federal Trade Commission Act. The court then found under section 5 of the Federal Trade Commission Act an injury to the public, either directly (effect on consumers) or indirectly (effect on competition), must be alleged and the act was not available to redress a purely private wrong.

As plaintiff points out in his brief, under section 5 of the Federal Trade Commission Act, the FTC is empowered and directed to prevent violations of the act through the use of unfair methods of competition. (15 U.S.C. §45(b).) Furthermore, one of the conditions of that section of the Act for the commission to take action against the violator is a finding by the commission that a proceeding would be to the interest of the public. 15 U.S.C. §45(b).

As properly framed, the question is whether the Illinois legislature, when it directed this court to give consideration to the interpretations of the Federal Trade Commission and the Federal courts relating to section 5a of the Federal Trade Commission Act, intended to graft on the public-interest language of the Federal statute. Contrary to the holding in the *Evanston Motor Co.* case, one could infer that the omission by the legislature of the public-interest language from the Illinois statute was a conscious decision to omit this requirement from the Illinois statute. This interpretation is bolstered by the fact that section 10a of the Consumer Fraud and Deceptive Business Practices Act provides for a private cause of action and specifically says that "any person" who suffers damage as a result of the violation of the Act may bring an action against that person for actual damages.

## Attorney's fees

Plaintiff has cross-appealed for a remandment of this cause to the

trial court for a determination and allowance of reasonable attorney's fees and costs that the plaintiff has incurred *in this appeal.*

Section 10a(c) of the Consumer Fraud and Deceptive Business Practices Act provides:

> "In any action brought by a person under this Section, the Court may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." Ill. Rev. Stat. 1979, ch. 121½, par. 270a(c).

In addition, section 3 of the Uniform Deceptive Trade Practices Act which provides for injunctive relief also states in part:

> "Costs or attorneys' fees or both may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice." Ill. Rev. Stat. 1979, ch. 121½, par. 313.

Plaintiff now argues that we should remand this cause to the trial court to allow assessment of his attorney's fees incurred in this appeal.

■■ The right to recover attorney's fees from one's opponent in litigation as a part of the cost thereof does not exist at common law. Such an item of expense is not allowable in the absence of a statute or rule of court or in the absence of some agreement expressly authorizing the taxing of attorney's fees in addition to the ordinary statutory costs. (20 Am. Jur. 2d *Costs* §72 (1965).) It has been the longstanding rule in Illinois that, in the absence of a statute, attorney's fees and the ordinary expenses and burdens of litigation are not allowed to the successful party. *House of Vision, Inc. v. Hiyane* (1969), 42 Ill. 2d 45, 245 N.E.2d 468.

■■ Given the fact that the fees for which the plaintiff is now requesting a remandment were not allowed at common law and are only permitted where there is an express authorization by statute, we strictly construe the statutes quoted above to provide for attorney's fees only in the trial court and not on appeal.

The trial court's order granting compensatory and injunctive relief to the plaintiff as well as attorney's fees incurred in the trial court is hereby affirmed, and plaintiff's request for the assessment of attorney's fees incurred on appeal is hereby rejected.

Affirmed.

GREEN, J., concurs.

Mr. JUSTICE WEBBER, dissenting:

I respectfully dissent from the majority's thinking.

Initially, I have serious reservations as to whether the Consumer Fraud and Deceptive Practices Act was ever intended to apply to the factual situation presented here.

The parties agree that the plaintiff and the defendant are the two principal manufacturers of dynamometers in the United States. The defendant adds, "and probably in the world." By analogy, we have General Motors Corporation suing Ford Motor Company, two parties with equal sophistication and business acumen.

It may then be asked whether the statute is intended to protect the lambs from the wolves, or the wolves from each other. I think the former. The short title is the "Consumer Fraud and Deceptive Business Practices Act" (Ill. Rev. Stat. 1979, ch. 121½, par. 272). The emphasis is on the consumer, and the apparent purpose is an effort to equalize economic power as between consumers and predators in the business world. Sections 2A through 2N of the Act (Ill. Rev. Stat. 1979, ch. 121½, pars. 262A through 262N) set forth a list of prohibited practices, nearly all of which apply only in a situation where a customer is being overreached: for example, chain referral sales (section 2A), avoidance of direct sales at a residence (section 2B), coupon sales (section 2J.1), non-English-language transactions (section 2N). The addition of section 5(a) of the Federal Trade Commission Act (15 U.S.C. §45) is merely the legislature's polite way of saying "etc." The Federal government has had many more years experience with the resourcefulness and ingenuity with the business community.

I also deem it significant that the principal enforcement powers are given to the Attorney General. The private rights of action were not added until some 15 years later. The power of the State is lent to the consumer in an additional effort to redress the balance. The limitation period is tolled and extended while the Attorney General is acting. (Ill. Rev. Stat. 1979, ch. 121½, par. 270a(e).) Section 5(a) of the Federal Trade Commission Act, incorporated by reference, deals with enforcement by the Federal Trade Commission, not by individuals. By adding the provisions for private enforcement, the legislature created a hodgepodge, but this in no way detracts from what I conceive to be the underlying purpose stated above, consumer protection, not policing of competition.

Apart from these philosophical considerations and assuming that plaintiff does have a cause of action, I find the proof woefully short. Plaintiff presented not a single witness to testify that he had been misled by the advertising. Instead, it relied on its profit-and-loss statement which admittedly showed a precipitous decline in profits. From this, plaintiff leaps to what has always been a logical fallacy: *post hoc ergo propter hoc*, an obscure but melodious way of saying that there is no causal connection. When dealing with lost profits, a slippery concept at best, it is not sufficient to say that there is *a* causal connection, it must be *the* causal connection. It is plain enough that you cannot sell many arctic boots in Chicago in July because of the weather, but is the same proposition true in December?

Since the first Athenian set up his *trapezion* in the *agora*, the morals of the marketplace have been something not likely to be tolerated by the Barbary pirates, but the solution as between equally potent parties lies not in litigation. For all its shortcomings, the market will see to it that he who lives by the sword will perish by the sword.

I would reverse the judgment in its entirety.