**JAYS FOODS, INC., a corporation, Plaintiff,**

v.

**FRITO–LAY, INC., a corporation, Defendant.**

No. 78 C 4352.

United States District Court, N.D. Illinois, E.D.

June 29, 1987.

Anthony S. DiVincenzo, Campbell & Di-Vincenzo, David C. Brezina, Brezina & Buckingham, Chicago, Ill., for plaintiff.

Earl E. Pollock, Kenneth H. Hoch, Jeffrey L. Dorman, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for defendant.

### MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Jays Foods, Inc. filed this action in 1978. It was primarily an antitrust case consisting of predatory pricing claims under section 2 of the Sherman Act, 15 U.S.C. § 2, and price discrimination claims under the Robinson-Patman Act, 15 U.S.C. § 13(a). Two successful summary judgment motions by the defendant, Frito-Lay, Inc., disposed of these federal antitrust claims. *Jays Foods, Inc. v. Frito-Lay, Inc.,* 614 F.Supp. 1073 (N.D.Ill.1985) (no triable issue concerning Sherman Act claim), 635 F.Supp. 103 (N.D.Ill.1986) (motion for reconsideration denied), 656 F.Supp. 843 (N.D.Ill.1987) (no triable issue concerning Robinson-Patman Act claim). All that remains are Jays' claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act"), Ill.Rev.Stat. ch. 121½, ¶ 262 *et seq.,* and the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, ¶ 311 *et seq.,* which have received scant attention until Frito-Lay filed this summary judg-

ment motion shortly before trial. The trial date was vacated and Frito-Lay's summary judgment motion is now granted.

## REMAINING CLAIMS

Jays' remaining claims relate to subparagraphs 20(f) and (k) of its amended complaint. In subparagraph 20(f) plaintiff alleges that Frito-Lay is

[e]ngaging and continues to engage in advertising and promotional practices which are directly tied to retailer's allocation of additional shelf space to Frito-Lay products to forestall market entry and lessen competition.

Subparagraph 20(k) charges Frito-Lay with

[i]llegally and improperly inducing store buyers and similarly situated personnel to give defendant additional shelf space, additional authorization for its products and/or excluding other competitors' products.

These allegations closely resemble the shelf space allegations in Jays' antitrust claims.

Jays intended to show at trial that Frito-Lay attempted to influence the allocation of retail shelf space by engaging in several unfair and deceptive practices. First, Jays would show that Frito-Lay urged retailers to allocate shelf space based on total snack food sales but it failed to use the shelf space it gained that way in a profit maximizing manner. For example, Frito-Lay devoted all newly gained space to its comparatively slow-selling regular potato chips. Second, Jays would show that Frito-Lay gained additional shelf space by presenting retailers with misleading and incomplete shelf space studies. For example, one such study, Frito-Lays' "mini-analysis," examined only total sales of snack foods, ignoring other variables such as profits, inventory turnover, location and service. Jays also would show that Frito-Lay stacked its products at the front of retail shelves, leaving unused space behind ("dummying up"), and left more of its products in certain stores than sales justified, moving them to stores with higher inventory turnover only just in time to prevent them from going stale ("rolling stock"). Jays contends that

these practices enabled Frito-Lay to occupy excessive shelf space at the expense of Frito-Lay's competitors, such as Jays.

Third, Jays would show that Frito-Lay engaged in promotional programs directly tied to the allocation of additional shelf space, a practice that Jays characterizes as "buying space." Finally, Jays would show that Frito-Lay took steps to skew sales when retailers were conducting shelf space tests to protect its shelf space allocations.

## DISCUSSION

The course of events has somewhat skewed the present dispute. The final pretrial order was filed in 1982, after discovery had been closed. That order, which was to govern the issues to be tried and listed the witnesses and exhibits, largely ignored the state law claims. After the summary judgments on the antitrust claims this court determined that the two state law claims remained, a very small tail on what had been a large and now dead dog. We assumed, on the basis of what had been previously represented, that plaintiff might be claiming, for example, that it had been excluded from some supermarket or convenience store chain for a time or had its shelf space reduced by such an enterprise, all because of defendant's conduct and that plaintiff would point to reduced sales to those enterprises as a result. The issues would be, in those circumstances, factual and legal—whether there was conduct which led to provable loss of sales and whether that conduct was illegal. A trial of those remaining narrow issues was contemplated to be short, resulting in a final judgment which would permit appeal of the antitrust decisions.

Plaintiff now claims that the passage of time nullifies the restrictions of the final pretrial order. It seeks to introduce evidence of everything which has happened since discovery closed for the purpose of ascribing to defendant's shelf space conduct the claimed difference between plaintiff's value at the beginning of 1984 (based on the sales price of the company in 1986) and what the value could have been. The amounts claimed exceed those of the anti-

trust claims. Defendant quite reasonably argues that plaintiff is seeking to litigate a new and different lawsuit about which there has been no discovery. We do not, however, reach that question because we conclude that the conduct of which plaintiff now complains does not create triable issues under Illinois law. Frito-Lay argues that the record shows there are no triable issues as to (1) the alleged violations of either of the two Illinois statutes Jays relies on; (2) the causation of Jays' claimed injury; and (3) Jays' theory of damages. Because Frito-Lay's first argument is persuasive, there is no need to examine the others.

Jays devotes a surprising amount of attention to the Illinois Deceptive Trade Practices Act. Section 2 of the Act, Ill.Rev. Stat. ch. 121½, ¶ 312, lists the kinds of conduct covered in twelve subparagraphs. The first eleven subparagraphs apply to specific kinds of deceptive conduct, such as passing-off, trademark infringement and false advertising. None of those subparagraphs is at issue here. Jays relies on subparagraph 2(12), Ill.Rev.Stat. ch. 121½, ¶ 312(12), which prohibits "conduct which similarly creates a likelihood of confusion or misunderstanding." The only conduct by Frito-Lay that might fit within that subparagraph is its alleged use of misleading shelf space studies, or perhaps its efforts to skew retailers' own shelf space studies. Because the Deceptive Trade Practices Act only applies to false or misleading conduct concerning goods or services, it does not apply to Frito-Lay's other non-deceptive conduct. *See Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 328, 13 Ill.Dec. 699, 703, 371 N.E.2d 634, 638 (1977); Ill. Rev.Stat. ch. 121½, ¶ 311 Prefatory Illinois Notes (the Act deals with "false, concealing, or deceptive trade identification, and false, confusing, or deceptive representations as to the source or origin of goods.").

■ But the Deceptive Trade Practices Act only provides for injunctive relief, plus costs and attorneys' fees in appropriate circumstances. Ill.Rev.Stat. ch. 121½, ¶ 313. Although Jays' original complaint in this action mentioned injunctive relief, this case has proceeded as a damage action since then. Neither the final pretrial order nor plaintiff's statement of issues to be tried indicate that anything other than damages is sought now. Because there is no damage remedy under the Deceptive Trade Practices Act, Frito-Lay is entitled to summary judgment on that part of Jays' claim.

If Jays is to recover damages it must proceed under the Consumer Fraud Act, which provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" ... are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

Ill.Rev.Stat. ch. 121½, ¶ 262; *see* Ill.Rev. Stat. ch. 121½, ¶ 270a (providing for a private damage action).

■ The Consumer Fraud Act incorporates Section 2 of the Deceptive Trade Practices Act by reference, but it is considerably broader. Like the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*, the Consumer Fraud Act applies to "unfair methods of competition." Unfair methods of competition include violations of the federal antitrust laws. *See, e.g., E.I. Du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136–37 (2d Cir.1984). However, Jays cannot proceed on an antitrust theory because of Frito-Lay's earlier successful summary judgment motions. Except for the possible violations of the Deceptive Trade Practices Act, Jays must show that Frito-Lay's shelf

space practices were unfair even though they did not violate the antitrust laws.

The Consumer Fraud Act is, by its terms, wide-ranging. In interpreting it, consideration shall be given to interpretations of the Federal Trade Commission Act, but the decision as to what is "unfair" is left to juries and the courts rather than to an administrative agency having experience and expertise.[1] Perhaps for this reason the Illinois courts have moved cautiously in fleshing out the contours of the Act. *See Evanston Motor Co. v. Mid-Southern Toyota Dist., Inc.,* 436 F.Supp. 1370, 1374 n. 4 (N.D.Ill.1977); *Frahm v. Urkovich,* 113 Ill. App.3d 580, 586, 69 Ill.Dec. 572, 576, 447 N.E.2d 1007, 1011 (1st Dist.1983) ("we do not interpret the liberal construction requirements to mean that liability under the Act is completely open-ended"). No Illinois case appears to have extended liability under the Consumer Fraud Act to the kind of conduct at issue here. Although the Illinois courts have often stated that unfair practices under the Consumer Fraud Act must be defined on a case-by-case basis, *e.g., Scott v. Ass'n for Childbirth at Home, Int'l,* 88 Ill.2d 279, 290, 58 Ill.Dec. 761, 767, 430 N.E.2d 1012, 1018 (1982), this court, as a federal court sitting in diversity jurisdiction, must be particularly hesitant to push the frontiers of state law. *See, e.g., Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 942 (7th Cir.1986); *Zick v. Verson Allsteel Press Co.,* 623 F.Supp. 927, 930 (N.D.Ill.1985).

In this action Jays has failed to develop any evidence showing that consumers are injured by Frito-Lay's conduct. The Illinois courts have limited liability under the Consumer Fraud Act to conduct that implicates consumer protection concerns. *See, e.g., Feldstein v. Guinan,* 148 Ill.App.3d 610, 615, 101 Ill.Dec. 947, 951, 499 N.E.2d 535, 539 (1st Dist.1986) ("the Act does not redress purely private wrongs but is for practices which affect the public generally");

*Frahm,* 113 Ill.App.3d at 586, 69 Ill.Dec. at 576, 447 N.E.2d at 1011 ("the Act is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong"); *see also M & W Gear Co. v. AW Dynamometer, Inc.,* 97 Ill.App.3d 904, 915, 53 Ill.Dec. 721, 731, 424 N.E.2d 356, 366 (4th Dist.1981) (Webber, J., dissenting) ("the emphasis is on the consumer and the apparent purpose is an effort to equalize economic power as between consumers and predators in the business world").

Several federal courts in this district, including this court, have followed that limitation. *See, e.g., Horsell Graphic Industries, Ltd. v. Valuation Counselors, Inc.,* 639 F.Supp. 1117, 1122 (N.D.Ill.1986); *Heritage Ins. Co. v. First Nat'l Bank,* 629 F.Supp. 1412, 1419 (N.D.Ill.1986); *Newman-Green, Inc. v. Alfonzo-Larrain R.,* 590 F.Supp. 1083, 1086–88 (N.D.Ill.1984). The Illinois Supreme Court has not squarely faced the issue, but its decisions also support limiting liability under the Consumer Fraud Act to conduct that deceives or exploits consumers. *See Scott v. Ass'n for Childbirth at Home, Int'l,* 88 Ill.2d at 285, 58 Ill.Dec. at 764, 430 N.E.2d at 1015 (Consumer Fraud Act applies to advertising and sale of educational and training services because "purchasers of educational services may be in as much need of protection against unfair or deceptive practices in their advertising and sale as are purchasers of any other service"); *Steinberg v. Chicago Medical School,* 69 Ill.2d at 328, 13 Ill.Dec. at 708, 371 N.E.2d at 638 (rejected medical school applicants could not sue under the Consumer Fraud Act because they were not consumers). The limitation does not prevent businesses from suing under the Consumer Fraud Act, but injury to consumers is an essential element of such a claim. *See, e.g., Newman-Green, Inc.,* 590 F.Supp. at 1087–88.

---

1. Consumer Fraud Act claims are frequently tried before a jury. *See, e.g., Warren v. LeMay,* 142 Ill.App.3d 550, 572–73, 96 Ill.Dec. 418, 432, 491 N.E.2d 464, 478 (5th Dist.1986); *Tague v. Molitor Motor Co.,* 139 Ill.App.3d 313, 93 Ill.Dec. 769, 487 N.E.2d 436 (5th Dist. 1985). However, the only court to face the issue held that the Consumer Fraud Act does not provide for jury trials. *Richard/Allen/Winter Ltd. v. Waldorf,* 156 Ill.App.3d 717, 109 Ill.Dec. 239, 509 N.E.2d 1078 (2d Dist.1987).

The Illinois courts have not uniformly formulated this consumer injury limitation and some courts have stated that it does not apply. *See, e.g., M & W Gear*, 97 Ill.App.3d at 913–14, 53 Ill.Dec. at 730, 424 N.E.2d at 365.[2] However, those cases have either involved consumer plaintiffs or conduct from which injury to consumers could be readily inferred. In *M & W Gear* the plaintiff successfully sued a competitor for false advertising. On appeal, the defendant argued that the plaintiff had failed to plead or prove any adverse effect on the public. The court rejected any public injury requirement and affirmed judgment for the plaintiff. However, as the court in *Newman-Green* observed, the *M & W Gear* court could easily have held that false advertising gives rise to a conclusive presumption of public injury to consumers. 590 F.Supp. at 1087 (citing *Evanston Motor Co.*, 436 F.Supp. at 1374 n. 6). In *Tague v. Molitor Motor Co.*, 139 Ill.App.3d 313, 316, 93 Ill.Dec. 769, 770–71, 487 N.E.2d 436, 437–38 (5th Dist.1985), the court rejected a public injury requirement, but there the plaintiff was a consumer complaining of odometer tampering and other misconduct in connection with the sale of a used car. In *Duncavage v. Allen*, 147 Ill. App.3d 88, 102, 100 Ill.Dec. 455, 463, 497 N.E.2d 433, 441 (1st Dist.1986), the court concluded that a tenant was a consumer under the Consumer Fraud Act, and relied on *Tague* in allowing a suit on behalf of a deceased tenant against a landlord.

Similarly, the court in *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 647 F.Supp. 1026, 1034–35 (N.D.Ill.1986), rejected any public injury requirement, but that was a class action by commercial borrowers against a bank. The plaintiffs were in the same position as consumers with respect to their loans, and the alleged misconduct involved deceptive practices addressed to a broad segment of the bank's market. *See Exchange Nat'l Bank v. Farm Bureau Life Ins. Co.*, 108 Ill.App.3d 212, 216,

63 Ill.Dec. 884, 887, 438 N.E.2d 1247, 1250 (3d Dist.1982) (holding that plaintiff borrowers had no Consumer Fraud Act claim "[i]n the absence of an allegation indicating such [deviant business] practices to be part of a pattern of defendant's lending activities ...". Thus *Haroco*, like *M & W Gear* on which it relied, may rest on an unnecessarily broad ground.

This court concludes, as it did in *Horsell*, that some consumer injury is an essential element of any claim under the Consumer Fraud Act. Perhaps where the plaintiff is a consumer, no further public injury need be shown. But where a suit is between competitors, as it is here, a plaintiff must show that the defendant's misconduct injured consumers generally. *See Hangstefer v. Insco*, No. 86 C 1022 (N.D.Ill. May 14, 1987) [Available on WESTLAW, DCT database]; *Maduff v. Life Ins. Co.*, 657 F.Supp. 437, 440 (N.D.Ill.1987) (both noting the apparent split in Illinois authority and concluding that allegations of public injury or effect on consumers generally are necessary to state a claim under the Consumer Fraud Act).

Although the consumer injury requirement is an independent element of any Consumer Fraud Act claim, including claims based on the incorporated Deceptive Trade Practices Act violations, it is similar in some respects to the issue of unfairness. The consumer injury requirement developed in part from concepts applied in determining whether a trade practice is unfair under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *See, e.g., Evanston Motor*, 436 F.Supp. at 1374. A practice that is neither a violation of the antitrust laws nor deceptive may still be unfair under section 5 if it offends some established public policy, if it is immoral, unethical, oppressive or unscrupulous, or if it is substantially injurious to consumers. *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir.1978) (citing *FTC v. Sperry Hutchinson & Co.*, 405 U.S. 233, 244–45 & n. 5, 92

---

**2.** Other Illinois cases have headed in the opposite direction, stating that only consumers have standing to sue under the Consumer Fraud Act. *See, e.g., McCarter v. State Farm Mutual Automobile Ins. Co.*, 130 Ill.App.3d 97, 101, 85 Ill.

Dec. 416, 419, 473 N.E.2d 1015, 1018 (3d Dist. 1985); *Carter v. Mueller*, 120 Ill.App.3d 314, 322, 75 Ill.Dec. 776, 783, 457 N.E.2d 1335, 1342 (1st Dist.1983).

S.Ct. 898, 905–06 & n. 5, 31 L.Ed.2d 170 (1972)); *see Scott v. Ass'n for Childbirth at Home, Int'l*, 88 Ill.2d at 290, 58 Ill.Dec. at 767, 430 N.E.2d at 1018 (citing *Spiegel* and *Sperry Hutchinson* with approval in defining unfair practices under the Consumer Fraud Act). The Federal Trade Commission has further refined the concept of unfairness under the FTC Act, clarifying that its primary focus is consumer injury; the public policy theory is used mainly to cross-check and confirm a finding of consumer injury, and the theory of immoral or unscrupulous conduct was abandoned altogether as an independent basis of liability. *See, e.g., International Harvester Co.*, 104 F.T.C. 949, 1060–61, 1070–76 (1984).

As the *Evanston Motor* court recognized, consumer injury under the Consumer Fraud Act can take two forms. Violations may affect consumers directly or indirectly by affecting competition. The plaintiff here has not attempted to set forth any evidence of a direct injury to consumers. Frito-Lay's alleged misconduct was directed to retailers, not to consumers. Further, although plaintiff contends that consumer's purchasing decisions were affected by changes in shelf space allocation, this court does not believe that such an effect can be characterized as an injury. *See Newman-Green*, 590 F.Supp. at 1088 n. 7.

Rather, Jays' case depends on showing that consumers are injured because Frito-Lay's conduct was anti-competitive. The Federal Trade Commission has recognized, at least implicitly, that efforts to influence retail shelf space allocations are not in themselves anti-competitive. In *Kellogg Co.*, 99 F.T.C. 8 (1982), the Commission filed a complaint against manufacturers of ready-to-eat cereals. The complaint counsel alleged in part that the manufacturers had a tacit agreement among themselves to avoid competition for shelf space in retail stores, an unfair practice under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. 99 F.T.C. at 141–50. The ALJ concluded that

> the record does not support complaint counsel's assertion that respondents had a tacit agreement to avoid competition

for shelf space in retail stores. Kellogg independently formulated a shelf space allocation plan that incorporated principles which were in accord with retailers' preferred methods of doing business. The other respondents, faced with the same requirements of retailers, responded with plans that incorporated the same basic principles. While each respondent competed for the most favorable shelf space location and the most space it could get, it was constrained not to push for more than a reasonable share in order to maintain rapport and credibility with retailers. Nevertheless, both General Mills and General Foods did present shelving alternatives in variations in an effort to gain competitive advantages.

99 F.T.C. 254.

Ultimately the complaint was dismissed. 99 F.T.C. at 269. In a separate statement Commissioner Clanton briefly discussed the shelf space allocation issues:

> It could be argued that an order restricting or preventing respondents from making shelf space recommendations would help to inject more competitive pressures into an important area of non-price competition, without intruding unnecessarily into respondent's day-to-day business judgments. On the other hand, this type of activity is undoubtedly normal commercial behavior that is engaged in by many other food manufacturers, although it is not clear whether the nature and pattern of recommendations in the cereal industry are followed in other markets.

> However, regardless of whether a workable remedy could be crafted on this subject, it is questionable whether the issue is at all important from a remedial standpoint.

99 F.T.C. at 277–78 (citing Schmalensee, *Entry Deterrence in the Ready-to-Eat Breakfast Cereal Industry*, 9 Bell J. Econ. 305, 307 n. 4 (1978)).

Competition for shelf space does not appear to be an unusual phenomenon, and some of Frito-Lay's exhibits show that Jays used tactics similar to Frito-Lay's in trying

to increase its own shelf space allocations. As *Kellogg Co.* suggests, there is no reason to assume that these efforts were anti-competitive. Jays contends that Frito-Lay's shelf space practices were anti-competitive because Jays and other potato chip companies were excluded from 7–Eleven stores. All that supports this contention, however, are certain internal memoranda from Frito-Lay. One document describes Frito-Lay's response to 7–Eleven's planned test-marketing of Frito-Lay's competitors' products (exh. 13). Another document is an enthusiastic letter to Frito-Lay salesmen, urging them to "[k]ick out our competition" (exh. 34). However, the letter does not mention 7–Eleven stores. A third document describes Frito-Lay's efforts to persuade 7–Eleven to eliminate plaintiff's products completely, leaving Frito-Lay as 7–Eleven's exclusive supplier (exh. 37).

The documents Jays relies on show that Frito-Lay is a hard-nosed, arguably over-zealous competitor. They do not, however, support the inference that Frito-Lay's shelf space practices were exclusionary. There is nothing in the record, for example, indicating that 7–Eleven was contractually bound to deal only with Frito-Lay, that Frito-Lay was able to coerce 7–Eleven into some sort of exclusive arrangement, or that Frito-Lay was otherwise able to prevent 7–Eleven from dealing with Frito-Lay's competitors. Moreover, Leonard Japp, Jr., a vice-president of Jays, testified on November 25, 1980 that the plaintiff was then supplying 7–Eleven and that some fifteen of its products were authorized in 7–Eleven stores. At the deposition, Mr. Japp explained that Jays had just been authorized to service 7–Eleven stores (Japp dep. at 410–12). The documents plaintiff relies on are dated at least several months before the deposition.

■ Without evidence that Frito-Lay's shelf space allocation practices were exclusionary, Jays' reliance on *FTC v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966) is misplaced. There the Supreme Court stated that the Federal Trade Commission had the power to declare an exclusive franchise program unfair without proof that its effect "may be to substantially lessen competition or tend to create a monopoly." 384 U.S. at 321, 86 S.Ct. at 1504. The Court held that the Commission had the power under section 5 of the FTC Act to arrest trade restraints in their incipiency, without proof that they amount to an outright violation of the antitrust laws. 384 U.S. at 322, 86 S.Ct. at 1504. In a brief opinion it reversed the Eighth Circuit Court of Appeals, which apparently reasoned that *Brown Shoe* could not have violated the FTC Act if it did not violate the antitrust laws.

■ Moreover, as the Fourth Circuit recognized in *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292–96 & n. 3 (4th Cir.1987), *Brown Shoe* does not hold that exclusive dealing arrangements are inherently anti-competitive. The plaintiff in *Ralston Purina* was a retail feed store operator. Ralston Purina terminated the store operator's dealership after the operator began selling a competitor's product. The store operator sued under the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39–5–20, which is similar in material respects to the Illinois statute at issue here. The store operator contended that Ralston Purina's exclusive dealing policy was an unfair trade practice. The Court of Appeals reversed a jury verdict in favor of the store operator, holding that the district court should have granted Ralston Purina's motion for judgment notwithstanding the verdict. After reviewing the standards concerning exclusive dealing arrangements and other vertical restraints under the federal antitrust laws, the Court determined that

> [the store operator] simply failed to offer the relevant evidence concerning the extent to which Ralston Purina may have used exclusive dealing arrangements to "foreclose the market," or, in other words, to keep competing brands of feed out of a substantial percentage of the feed dealerships in the area. Instead, almost all of [the store operators] evidence related to his own individual experience with Ralston Purina. That alone

is not enough to show a negative impact on competition in the market as a whole. 810 F.2d at 1295; *see Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Beltone Electronics Corp.*, 100 F.T.C. 68, 192–221 (1982); *see also Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (rule of reason applies to vertical competitive restraints).

Thus, as *Ralston Purina* illustrates, even if Frito-Lay's practices were exclusionary to some degree, they were not necessarily anti-competitive. As the Court's earlier opinion suggests, plaintiff's evidence on that issue is too scanty to support the conclusion that they were. Rather than developing evidence bearing on the foreclosure of a significant amount of competition in some relevant market, plaintiff has focused on its own declining fortunes and asks this court to draw unwarranted inferences.

Jays argues that direct evidence of anti-competitive effects is unnecessary in light of their evidence of Frito-Lay's anti-competitive intentions and Frito-Lay's failure to act in a profit-maximizing fashion. This court has already observed that "[s]tanding by itself, Jays' intent evidence is wholly insufficient to establish Frito-Lay's predatory intent." 614 F.Supp. at 1073. No anti-competitive effects can be inferred from this evidence. Similarly, Frito-Lay's alleged failure to maximize profits in arranging its shelf space displays cannot itself establish a violation of the Consumer Fraud Act. *See Perrin v. Pioneer Nat'l Title Ins. Co.*, 83 Ill.App.3d 664, 672–63, 39 Ill.Dec. 124, 131, 404 N.E.2d 508, 515 (1st Dist.1980) (giving bigger volume discounts than cost savings would justify is not actionable under the Consumer Fraud Act); *cf.* 614 F.Supp. at 1082, (citing *MCI Comm. Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1114 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (rejecting a profit maximization test for predatory pricing).

■ Moreover, Jays' contention that proof of anti-competitive effects is unnecessary where there is evidence of some anti-competitive purpose or lack of an independent business justification is based on a misreading of the *Du Pont* case. In *Du Pont*, a parallel pricing case, the Second Circuit rejected the FTC's position that non-collusive, non-predatory and independent conduct of a non-artificial nature could be unfair under Section 5 of the FTC Act where it resulted in a substantial lessening of competition. 729 F.2d at 137. In vacating the FTC's order the Second Circuit stated that evidence of an anti-competitive purpose or lack of an independent business justification might substitute for proof of a tacit agreement, not that such evidence could substitute for proof of anti-competitive effects. 729 F.2d at 139–40. Finally, as courts have repeatedly observed, injury to a competitor is not the same thing as injury to competition. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); *Ball Memorial Hospital v. Mutual Hospital Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986); *Newman-Green*, 590 F.Supp. at 1087 & n. 6.

Without evidence that Frito-Lay's shelf space activities were anti-competitive, Jays cannot establish the consumer injury element of its claim under the Consumer Fraud Act. For the same reason Jays cannot establish that Frito-Lay's non-deceptive shelf space practices were unfair. If Jays were seeking injunctive relief, perhaps plaintiff nevertheless could proceed to trial under the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, ¶ 311 *et seq.*, on its claim that Frito-Lay deceived retailers by using incomplete data in its shelf allocation "mini-analysis" or by sabotaging retailers' own shelf-space studies. However, it cannot recover damages under the Deceptive Trade Practices Act. Under the circumstances, Frito-Lay is entitled to summary judgment.

## CONCLUSION

Frito-Lay's motion for summary judgment is granted.