**W.E. O'NEIL CONSTRUCTION CO., Plaintiff,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Defendant.**

No. 89 C 909.

United States District Court, N.D. Illinois, E.D.

Aug. 31, 1989.

As Modified Oct. 26, 1989.

purchase 300 shares of Beatrice stock and 500 shares of FSB stock. Govt.Ver., at 1–2.

Ira Gould, Michael A. Reiter, David A. Balmuth, Holleb & Coff, Chicago, Ill., for plaintiff.

John F. Brennan, Mary F. Stafford, Clausen Miller Gorman Caffrey & Witous, James O. Nolan, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

## I. INTRODUCTION

This is a dispute between W.E. O'Neil Construction Company ("O'Neil") and National Union Fire Insurance Company of Pittsburgh ("National Union") concerning the scope of coverage of an insurance policy issued by National Union to O'Neil. Jurisdiction is based on diversity of citizenship. Pending is National Union's motion to dismiss the complaint. For the reasons described below, the motion is denied.

## II. FACTS

Because this is a motion to dismiss, the Court accepts as true the facts alleged in O'Neil's complaint. *See Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### A. *The Loss*

On June 18, 1985, O'Neil entered into a construction contract with Underwood Towers Limited Partnership ("the Owner") to build a project consisting of two apartment towers, various townhomes, and a four-level concrete parking garage which was to be attached to the apartment towers. O'Neil contracted with several subcontractors to build the garage.

The garage was constructed between May 1986 and December 1986. At the end of 1986, the concrete floors and walls of the garage began to crack. Sometime prior to March 31, 1987, the garage began to be used for parking. At this time, however, the cracking worsened. The cracks increased in length and width, and water began to leak through the cracks. On March 24, 1987, the Owner requested that the cracks be grouted and caulked in order to stem the growth of the cracking. The grouting and caulking began before March 31 and continued thereafter. However, the cracking continued to worsen through mid-1987.

In the fall of 1987, the Owner and O'Neil each commissioned experts to determine the cause of the cracking. In the spring of 1988, both experts issued reports which concluded that the primary cause of the cracking was the improper placement by G & H Steel, one of O'Neil's subcontractors, of the steel mesh imbedded in the concrete levels. The purpose of that mesh was to help ensure the structural integrity of the garage and to protect the garage against the effects of weather. In the spring of

1988, the Owner made a claim against O'Neil, asserting that the garage was damaged by the cracking and was unusable above the first floor. The Owner claimed that O'Neil, among others, was liable to the Owner for its losses, which it estimated would exceed five million dollars. O'Neil denied any liability for the Owner's loss. On April 27, 1988, the Owner made its first written claim against O'Neil.

## B. *The Insurance Dispute*

For the period from March 31, 1986 to March 31, 1987, O'Neil was insured under a comprehensive general liability insurance policy issued by National Union. The policy was a standard form policy, and it included as well a standard Broad Form Comprehensive General Liability Endorsement ("Broad Form Endorsement"), which removed certain exclusions and replaced them with less restrictive exclusions. The policy had a one million dollar limit of liability. O'Neil paid National Union a premium of $675,540 for the policy. Upon expiration of the policy on March 31, 1987, O'Neil became insured by Liberty Mutual Insurance Company ("Liberty Mutual"). The Liberty Mutual policy was similar to the National Union policy, and it contained an identical Broad Form Endorsement. The Liberty Mutual policy expired on March 31, 1988.

O'Neil gave National Union written notice of the Owner's claim against it on May 23, 1988. On July 1, 1988, O'Neil provided additional notice to National Union, tendered its defense of the Owner's claim to National Union, and demanded indemnification pursuant to the policy.

During the summer and fall of 1988, various meetings took place between O'Neil, subcontractors, the garage architect, the garage engineer, various insurance carriers and other parties to discuss the cracking of the garage and to attempt to settle the Owner's claim. Although National Union never responded in writing to O'Neil's tender of coverage, National Union participated in all of these meetings as O'Neil's insurer. At all but one of these meetings, National Union was represented by J. Donald Tierney. Tierney investigated the Owner's claim on behalf of National Union and was familiar with the facts of the loss and the contentions of the parties.

On several occasions, National Union acknowledged coverage under the policy. The only issue which National Union raised was whether the cracking occurred during the period covered by the National Union policy as opposed to the Liberty Mutual policy. National Union informed O'Neil that it would contribute to a settlement of the Owner's claim and consistently urged O'Neil to increase its settlement offers to the Owner.

In late November, 1988, with National Union's knowledge and approval, O'Neil agreed to settle the Owner's claim against O'Neil for 1.8 million dollars. Tierney, on behalf of National Union, told O'Neil that this was a good settlement and recommended that O'Neil settle the Owner's claim for this sum. In response to O'Neil's claim that G & H Steel was liable to indemnify O'Neil for losses arising out of the Owner's claim, G & H's Steel's insurer, Liberty Mutual, agreed to contribute $900,000 of the $1.8 million settlement on behalf of G & H Steel. Tierney urged O'Neil to accept this contribution. He also urged O'Neil not to demand additional money from Liberty Mutual to settle the Owner's claim, because he feared that Liberty Mutual would withdraw its $900,000 contribution on behalf of G & H Steel.

On December 2, 1988, O'Neil presented National Union with facts which demonstrated that excessive cracking had taken place before March 31, 1987, and was thus within the scope of the National Union policy. O'Neil requested that National Union pay the $900,000 settlement contribution on behalf of O'Neil. National Union refused to pay the $900,000 settlement contribution. For the first time, National Union claimed that the policy did not cover the claim regardless of when the cracking occurred. O'Neil then funded the $900,000 settlement contribution through its own money.

### C. *The Lawsuits*

O'Neil filed this lawsuit against National Union in federal court on February 3, 1989. In Count I, O'Neil alleges that National Union's conduct constitutes a breach of the insurance contract. In Count II, O'Neil claims that National Union is liable in tort for bad faith denial of insurance coverage. In Count III, O'Neil alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½ ¶¶ 261 *et seq.* Approximately 39 minutes after this federal lawsuit was filed, National Union filed an action in state court for declaratory relief, raising the same factual and legal issues. Although it is not clear that National Union knew at that time that the federal lawsuit had been filed, it had been advised the previous month that O'Neil planned to file suit unless National Union agreed to pay the sum for which O'Neil contended it was liable.[1]

National Union argues that the federal case should be dismissed or stayed in light of the parallel state action. Alternatively, National Union contends that each of the three counts of the complaint fail to state a claim.

### III. ABSTENTION

National Union contends that the case should be dismissed pursuant to § 2–619(a)(3) of the Illinois Code of Civil Procedure, Ill.Rev.Stat. ch. 110 § 2–619(a)(3), which provides for dismissal of an action in deference to a parallel action in another court. Alternatively, National Union contends that the case should be stayed pursuant to the federal common law abstention doctrine developed in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and subsequent cases.

### A. *Section 2–619*

Section 2–619(a)(3) provides in part:

Defendant may, within the time for pleading, file a motion for dismissal of the action for other appropriate relief upon any of the following grounds:

. . . . .

that there is another action pending between the same parties for the same cause.

Before the Court reaches the issue of whether application of § 2–619(a)(3) would warrant dismissal under the facts of this case, the Court must determine whether § 2–619(a)(3) applies at all to a case pending in federal court.

In *Seaboard Finance Co. v. Davis*, 276 F.Supp. 507 (N.D.Ill.1967) (Will, J.), a plaintiff filed suit in federal court in Illinois only after previously commencing an action against the same defendants in California state court. The defendants moved to dismiss the Illinois federal case pursuant to § 48(1)(c) of the Illinois Civil Practice Act, the predecessor to § 2–619(a)(3). The court noted that there was no federal doctrine which would allow dismissal under those circumstances, and that although there was a federal doctrine of abatement, that doctrine applied only where the parallel actions were pending in different federal courts, rather than in a state and a federal court. In order to determine whether to apply the state rule, the court reviewed the case law concerning application of state law in federal courts sitting in diversity jurisdiction. After reviewing those cases, the court held that the Illinois statute should apply in federal court, and accordingly dismissed the case.

The decision in *Seaboard* has been followed in subsequent district court cases, although generally without substantial independent analysis. *See, e.g., Byer Museum of Arts v. North River Ins. Co.*, 622 F.Supp. 1381, 1383–85 (N.D.Ill.1985) (Hold-

---

**1.** *See* Affidavit of Ira Gould at ¶ 3. Defendant has moved to strike this affidavit and the affidavit of Michael Reiter, both of which were submitted by O'Neil in conjunction with its response to the motion to dismiss. With respect to the affidavit of Reiter, the motion to strike is moot because the Court has not relied upon the affidavit. With respect to the affidavit of Gould, the motion is denied. Although the issue of National Union's advance knowledge of the filing of O'Neil's complaint is of marginal relevance, the Court finds the affidavit helpful on that issue and appropriate for the Court's consideration.

erman, J.); *Brite Industries, Inc. v. Anderson*, No. 81 C 5593 (N.D.Ill. March 25, 1982) (Kocoras, J.).[2] The district courts have not, however, been universally comfortable with continued application of this holding. *See, e.g., Simenc v. Holiday Inns, Inc.*, No. 83 C 5618, 1984 WL 2139 (N.D.Ill. Feb. 10, 1984) (Moran, J.) (expressing doubts as to the continued validity of application of § 2–619(a)(3) by federal courts).

The federal district courts which have applied § 2–619(a)(3) generally have not considered whether such application remains appropriate in light of the abstention doctrine first developed in *Colorado River, supra,* which was decided 9 years after *Seaboard.* The *Colorado River* doctrine provides for a stay of a federal case in deference to a pending state case in certain limited circumstances. *See infra* at Part III.C. In light of the growth of federal abstention doctrine since the decision in *Seaboard,* the Court finds it appropriate to reevaluate the issue of § 2–619(a)(3)'s application by federal courts.

■ Although state law provides the substantive rules of decision in diversity cases, "matters of procedure—of practice—are determined under federal law." *Coleman v. McLaren,* 590 F.Supp. 38, 39 (N.D.Ill.1984) (Shadur, J.), *citing Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Where there is a conflict between a federal common law rule and state law, the state law will not be followed by a federal court where the interests underlying the state law are "merely procedural." *See In re Air Crash Disaster Near Chicago,* 803 F.2d 304, 313–15 (7th Cir.1986).

■ It is readily apparent that the interests underlying Section 2–619(a)(3) are "merely procedural," particularly with ref-

erence to the only way in which the statute conflicts with federal abstention doctrine—i.e., whether the federal court case should be stayed or dismissed. Indeed, "[a]ny provision deriving from a state's code of civil *procedure* (the title of ch. 110 of the Illinois Revised Statutes) starts out at least inherently suspect as a putative source of power for a federal court." *Coleman,* 590 F.Supp. at 39 (emphasis in original). Because § 2–619(a)(3) speaks only to matters of procedure or "court administration about which the federal courts have independent competence," *Air Crash Disaster,* 803 F.2d at 315 (citation omitted), the Court finds that application of the statute by a federal court would be inappropriate.

This conclusion is buttressed by the development of the *Colorado River* abstention doctrine. In *Seaboard,* Judge Will did not find any strong federal considerations which justified application of federal rather than state law. *See Simenc,* 1984 WL 2139 at 12. Such a strong federal interest was subsequently recognized, however, in *Colorado River,* which held that a federal court should abstain only rarely, in light of "the unflagging obligation of the federal courts to exercise the jurisdiction given them." 424 U.S. at 817, 96 S.Ct. at 1246. Furthermore, federal courts have devised an extensive body of law on the subject of when *Colorado River* abstention is appropriate. *See infra* at Part III.B. Based on the procedural nature of Section 2–619(a)(3), the tension between that statute and the federal court's obligation to exercise properly conferred jurisdiction, and the development of a body of federal law governing the issue, the Court holds that application of the state rule of civil procedure by a federal court is inappropriate.[3]

**B.** *Colorado River*

■ Whether to stay federal proceedings in light of parallel state litigation is a deci-

---

**2.** *See also Commonwealth Edison Co. v. Gulf Oil Corp.,* 541 F.2d 1263, 1271–72 (7th Cir.1976) (noting *Seaboard's* holding but expressing no opinion as to the merits).

**3.** Even if the Court were to apply § 2–619(a)(3), the outcome in this case would not differ. The factors for determining whether dismissal is warranted pursuant to § 2–619(a)(3) are the

same factors which are considered in determining whether a stay is appropriate under *Colorado River. See Byer Museum,* 622 F.Supp. at 1384. Because application of those factors counsels against a stay, *see infra* at Part III.B., application of those factors would also counsel against dismissal pursuant to § 2–619(a)(3).

sion which is committed to the district court's discretion. *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 665, 98 S.Ct. 2552, 2558, 57 L.Ed.2d 504 (1978); *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1286 (7th Cir.1988). "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case with the balance heavily weighted in favor of jurisdiction." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983). A non-exhaustive list of ten factors has been developed by the case law as appropriate for consideration in determining whether *Colorado River* abstention is appropriate: (1) "which, if either, court first assumed jurisdiction over property," (2) "the inconvenience of a federal forum," (3) "the desirability of avoiding piecemeal litigation," (4) "the order in which jurisdiction was obtained by the concurrent forums," (5) "the source of governing law, state or federal," (6) "the adequacy of the state court's action to protect the federal plaintiff's rights," (7) "the relative progress of the state and federal proceedings," (8) "the presence or absence of concurrent jurisdiction," (9) "the availability of removal," and (10) "the vexatious or contrived nature of the federal claim." *Interstate Material*, 847 F.2d at 1288 (citations omitted). *See also Lumen Construction, Inc. v. Brandt Construction Co.*, 780 F.2d 691, 694–95 (7th Cir.1986).

■ Weighing in favor of a stay in this case are the desirability of avoiding piecemeal litigation, the source of governing law, and the presumed adequacy of the state law action to protect the rights of the federal plaintiff, which is an Illinois corporation. Weighing in favor of retention of jurisdiction are the fact that federal jurisdiction was obtained before the state court claim was filed and the relative progress of the state and federal proceedings (the federal action appears to be moving more quickly than the state action). In light of the Court's general duty to exercise its jurisdiction, pursuant to which the *Colorado River* abstention doctrine should be applied only in limited circumstances, *see LaDuke v. Burlington Northern Railroad Co.*, 879 F.2d 1556, 1558 (7th Cir.1989), the Court finds that the factors favoring retention of jurisdiction outweigh the factors weighing in favor of a stay. "When [a stay] operates to deny a litigant a federal forum to which the jurisdictional statutes appear to entitle him it should not be granted unless there are reasons going beyond the interest in judicial economy, an interest engaged whenever there are parallel suits." *Evans Transportation Co. v. Scullin Steel Co.*, 693 F.2d 715, 718 (7th Cir.1982).

Where, as here, the factors weighing in favor of a stay are relatively insignificant, raising no compelling reason for a stay, the Court finds the plaintiff's choice of forum and the order of filing to be of substantial importance. National Union disagrees, citing *Evans*, 693 F.2d at 718, where the court stated: "[T]he order of filing ... has little significance by itself." National Union's citation of this sentence, however, is out of context. In *Evans*, the court was responding to an argument that the federal court should stay the federal action because it had been filed one month later than the state court action. The court found that despite the earlier filing of the state action, the federal action should not be stayed. The instant action presents, in this respect, a stronger case for exercise of federal jurisdiction, because the federal plaintiff did not sit on its rights but rather filed suit before the federal defendant filed the parallel state court suit.

The Court denies National Union's request for a stay or dismissal of the federal action in light of the parallel state court litigation.

## IV. BREACH OF CONTRACT

National Union argues that Count I, the breach of contract count, fails to state a claim because the insurance policy does not cover the loss and because plaintiff has failed to comply with a condition precedent of the policy. With respect to the coverage

issue, National Union contends that the Owner's claim against O'Neil is not for "property damage" covered by the policy and that even assuming that it is for property damage, the claim is subject to the policy's exclusion of coverage for damage due to faulty workmanship.

## A. *Property Damage*

### 1. Property of the Insured

The Court initially notes that "[w]here there is an ambiguity in an insurance policy, all exclusions, conditions, or provisions which tend to limit or defeat liability should be construed most favorably to the insured." *Marathon Plastics, Inc. v. International Ins. Co.*, 161 Ill.App.3d 452, 464, 514 N.E.2d 479, 486, 112 Ill.Dec. 816, 823 (4th Dist.1987). *See also Goldblatt Brothers, Inc. v. Home Indemnity Co.*, 773 F.2d 121, 125 (7th Cir.1985); *FSC Paper Corp. v. Sun Ins. Co.*, 744 F.2d 1279, 1282 (7th Cir.1984).

■ The insurance policy at issue in this case defines "property damage" as:

(1) physical injury to or destruction of tangible property which occurs during the policy period including the loss thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

(Complaint, ¶ 43.) In interpreting this standard definition, the courts "have consistently differentiated between damage to the product of the insured, and damage to other property caused by that product." *Economy Lumber of Oakland v. Insurance Company of North America*, 157 Cal.App.3d, 641, 204 Cal.Rptr. 135, 139 (1984). *See also Marathon Plastics, supra,* 161 Ill.App.3d at 462–63, 514 N.E.2d at 485, 112 Ill.Dec. at 822. Damage to the product of the insured is not covered. *See, e.g., Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681 (7th Cir.1977); *Ham-*

*ilton Die Cast, Inc. v. U.S. Fidelity & Guaranty Co.*, 508 F.2d 417 (7th Cir.1975); *Ludwig Candy Co. v. Iowa National Mutual Ins. Co.*, 78 Ill.App.3d 306, 396 N.E.2d 1329, 33 Ill.Dec. 605 (1st Dist.1979). Physical damage to other property, however, constitutes "property damage" and is therefore covered. *See, e.g., Hamilton Die*, 508 F.2d at 419–420; *U.S. Fidelity & Guaranty Co. v. Nevada Cement Co.*, 93 Nev. 179, 561 P.2d 1335 (1977).

■ Where a defective product manufactured or installed by the insured has been integrated with someone else's property, it is clear that damage to that property as a whole, excluding the cost of repairing or replacing the defective part, constitutes property damage. *See Marathon Plastics,* 161 Ill.App.3d at 463–64, 514 N.E.2d at 485, 112 Ill.Dec. at 822; *Pittway Corp. v. American Motorists Ins. Co.*, 56 Ill.App.3d 338, 341, 370 N.E.2d 1271, 1274, 13 Ill.Dec. 244, 247 (2d Dist.1977); *Elco Industries, Inc. v. Liberty Mutual Ins. Co.*, 46 Ill.App.3d 936, 938, 361 N.E.2d 589, 591, 5 Ill.Dec. 266, 268 (1st Dist.1977). In the cited cases, however, the insured's product was integrated into a larger product which was not itself a product of the insured. The question facing this Court is whether the same principle applies where the insured is a general contractor for an entire building or project which has been damaged by the inclusion of a defective part installed or produced by a subcontractor. On behalf of the insurance company, it may be argued that all of the damage is to the product of the insured, and it does not, therefore, constitute property damage. The Court, however, is not willing to broaden to such an extent the principle that damage to the insured's product itself does not constitute property damage. In order to construe the defective steel mesh as the product of O'Neil, it is necessary to put O'Neil in the place of its subcontractor, G & H Steel.[4] If the insured is placed in the position of its subcontractor for this pur-

---

**4.** In other places, the insurance policy makes explicit the treatment of a subcontractor's product as a product of the insured. For instance, Exclusion VI(A)(2)(d)(iii) excludes coverage for certain damage caused by faulty workmanship "by or on behalf of the insured." *See infra* at Part IV.B.

pose, it seems reasonable that the insured is also placed in the position of the subcontractor for the purpose of determining whether damage to the entire structure constitutes damage to the product of the manufacturer of the defective component. The entire garage clearly is not the product of G & H Steel; if O'Neil is to be placed in the position of G & H Steel for purposes of determining whether the damage is to the product of the insured, it is also reasonable to construe damage to the remainder of the garage as property damage for the purpose of determining coverage. This reading is in accord with the principle that ambiguities in the insurance policy will be construed against the insurer. *See supra* at 990.

Furthermore, as explained *infra* at Part IV.B, courts have concluded that the narrower faulty workmanship clause endorsement which is part of the policy in this case does not exclude coverage for damages to the remainder of a structure built by a general contractor where the faulty workmanship involved only one component of the structure. To interpret "property damage" as excluding coverage of the entire garage would render meaningless that narrower faulty workmanship clause. Although those cases did not explicitly address the definition of "property damage," they necessarily must have interpreted the term in the broad sense adopted by this Court in order to reach their holdings.

Finally, this Court's interpretation of "property damage" is supported by the case of *Hamilton Die, supra:*

> [P]laintiff contends ... that there was "property damage" to the finished product [the tennis racket] by reason of the incorporation of the allegedly defective part, the frame. We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes "property damage" within the meaning of the policy. For example, if an automobile crash results from the failure of a defective tire, the defective component

can be said to have caused "property damage" to the finished product. If, however, some of the tires purchased by the automobile manufacturer are found to be defective and the manufacturer therefore withdraws his cars from the market, there has not been "injury to or destruction of tangible property" which is ... the definition of "property damage" in the policy.

508 F.2d at 419–20. *Hamilton Die* implies that there would have been "property damage" if the manufacturer of the product—the entire tennis racket—had used a defective part which damaged the remainder of the product. The Court concludes that damage to the entire structure resulting from the inclusion of a defective component constitutes "property damage" within the meaning of the policy, even where the insured is a general contractor responsible for the construction of the entire structure.

### 2. Economic Losses

■ National Union also contends that it is not liable because "property damage" does not include economic losses, and that the only losses claimed by the Owner against O'Neil are such economic losses. The Court rejects National Union's argument that economic losses are not covered, based on two independent grounds. First, the policy specifically defines "property damage" as including "loss of use of tangible property which has not been physically injured or destroyed." Second, the Court disagrees with National Union's position that the case law has interpreted "property damage" as excluding all types of economic losses. However, National Union's argument requires an examination of the history of the case law on the economic loss issue.[5]

In *Hamilton Die, supra,* the Court, applying Ohio law, held that "property damage" did not include claimed damages for injury to intangible property. 508 F.2d at 419. Thus a claim for loss of investment, loss of anticipated profits, and loss of goodwill was excluded from the policy's coverage. In *Dries & Krump Mfg. Co. v. Phoe-*

---

**5.** None of the cases discussed below appear to have involved an insurance policy which included "loss of use of tangible property" in the definition of "property damage".

*nix Ins. Co.*, 548 F.2d 681 (7th Cir.1977), the court reaffirmed this principle and held that "at least where property damage is defined as 'tangible' property damage, some actual injury to 'tangible' property must be alleged before consequential damages such as loss of use may be recovered." 548 F.2d at 687. The court affirmed a district court holding that the loss of use of a special structure built to house a defective brake and the reduction in the market value of that structure did not constitute "property damage" within the meaning of the policy.

In *Pittway Corp. v. American Motorist Ins. Co.*, 56 Ill.App.3d 338, 370 N.E.2d 1271, 13 Ill.Dec. 244 (2d Dist.1977), the court allowed recovery for the diminution in value of a product manufactured and owned by a third party. The court recognized a "majority position which holds that the term 'property damage' includes tangible property which has been diminished in value or made useless irrespective of any actual physical injury to the tangible property." 56 Ill.App.3d at 342, 370 N.E.2d at 1274, 13 Ill.Dec. at 247 (citing cases). The court further stated:

> In the case before us damage to tangible property, that is the completed product, is alleged and not mere economic damage in the nature of loss of investment, anticipated profits and financial interests. We conclude that the damage to the completed product exclusive of the value of the defective product furnished by Pittway amounts to damage to tangible personal property within the terms of the policy.

*Id.* The court read *Hamilton Die* as being consistent with this holding, but further stated that if *Hamilton Die* were read to support the proposition that coverage for property damage is dependent on physical injury to property, it would not be followed.

In *Ludwig Candy Co. v. Iowa National Mutual Ins. Co.*, 78 Ill.App.3d 306, 396 N.E.2d 1329, 33 Ill.Dec. 605 (1st Dist.1979), the court held that a policy did not cover a claim by a retailer against a manufacturer of defective candy for loss of profits, damage to business reputation, and loss of good will. The court relied on *Hamilton Die* and *Dries & Krump*, apparently distinguishing *Pittway* on the basis that *Pittway* involved diminution in value or use rather than such economic damages as loss of investment, anticipated profits or financial interests. A similar analysis was followed in *Sentry Ins. Co. v. S & L Home Heating Co.*, 91 Ill.App.3d 687, 414 N.E.2d 1218, 47 Ill.Dec. 102 (1st Dist.1980), in which the insured had designed and installed a heating, ventilation and air conditioning system in an industrial plant. Defects in the system caused, among other things, a loss of productivity and profits, which the court characterized as economic loss and not property damage. 91 Ill.App.3d at 690, 414 N.E.2d at 1221, 47 Ill.Dec. at 105.

In *American Motorists Ins. Co. v. Trane Co.*, 544 F.Supp. 669 (W.D.Wis.1982), the court was faced with the issue of whether a 25 percent reduction of a plant's operations constituted compensable property damage. The court refused to follow *Hamilton Die*, noting that it involved only Ohio law and that it had been undermined by the reasoning in *Pittway*. The court held that under Wisconsin law, property damage does not require physical damage to property, and may instead take the form of diminished value or loss of use. The Seventh Circuit affirmed, 718 F.2d 842 (7th Cir.1983), adopting the district court's opinion. The Seventh Circuit did not address the continuing vitality of *Hamilton Die*, but it left open the possibility that "the 'loss of use' must have its origin in a physical infirmity." 718 F.2d at 844. In *McDowell–Wellman Engineering Co. v. Hartford Accident and Indemnity Co.*, 711 F.2d 521 (3d Cir.1983), the court declined to follow *Hamilton Die* in favor of "a majority view that the term property damage does not require actual physical damage but can include intangible damage such as the diminution in value of tangible property." 711 F.2d at 525–26 n. 7.

In *CMO Graphics, Inc. v. CNA Insurance*, 115 Ill.App.3d 491, 450 N.E.2d 860, 71 Ill.Dec. 172 (1st Dist.1983), the court held that a liability policy did not cover damages caused by the insured's defective

graphics produced for use in advertising supplements. The court held that the complaint was limited to damages in the nature of economic losses, and that there was no allegation of damage caused to the products themselves or of a diminution in market value of those products. 115 Ill.App.3d at 496–97, 450 N.E.2d at 863–64, 71 Ill.Dec. at 175–76.

In *Marathon Plastics, supra,* defective pipes and seals supplied by the insured had caused damage to a water system in which they were incorporated, and the Illinois Appellate Court for the Fourth District concluded that "even though no physical injury occurred to the water system, ... due to the diminution in value to the system caused by the leaks, property damage has occurred." 161 Ill.App.3d at 463, 514 N.E.2d at 485, 112 Ill.Dec. at 822.

The above case law, while not always consistent, reflects a general distinction between claims for "diminution in value" or "loss of use," which are covered as "property damage," and claims for anticipated profits or loss of investment, which are not covered. The question, then, is whether the damages claimed against the insured in this case are more like the former or the latter. O'Neil's complaint, unfortunately, is not specific in describing the Owner's claim. However, a reasonable inference from the complaint is that the Owner's damage reflects a diminution in the market value of garage spaces which the Owner desired to rent to car owners. This case is thus more like *American Motorists* (reduction in plant capacity) or *Pittway* (diminution in market value of hair spray products) than like *Ludwig Candy* (damage to expected profits, reputation and goodwill) or *CMO Graphics* (alleged damages of lost profits and lost good will). National Union's motion to dismiss on the basis that only "economic" losses are claimed is therefore denied, because the policy specifically covers "loss of use" of property and, alternatively, because the case law does not support defendant's narrow reading of the

scope of losses which are generally recoverable as property damage.[6]

### B. *Faulty Workmanship Exclusion*

■ National Union next contends that the loss is excluded by the policy's faulty workmanship exclusion, which is one of the exclusions narrowed by the Broad Form Endorsement. Pursuant to this exclusion, contained in Paragraph VI(A)(2)(d), the insurance policy does not apply:

(d) to that particular part of any property, not on premises owned by or rented to the insured,

(i) upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out of such operations, or

(ii) out of which any property damage arises, or

*(iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured.*

(Emphasis added.) The standard faulty workmanship exclusion which is replaced by the Broad Form Endorsement is exclusion *(o),* which excludes coverage for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." If the policy in this case did not include the Broad Form Endorsement, and if exclusion *(o)* thus applied, it is clear that the faulty workmanship provision would exclude coverage for the loss incurred in this case. For instance, in *Indiana Ins. Co. v. DeZutti,* 408 N.E.2d 1275 (Ind.1980), the insured was a general contractor responsible for the construction of an entire house. The house became damaged because of the improper construction of the house's footing. The court described the issue as "whether exclusion *(o)* applies to the damage to the entire house as being [the contractor's] work, or only applies to the footing which

---

**6.** If O'Neil elects to amend its complaint (a motion for leave to amend has been entered and continued pending determination of the motion to dismiss), it would be well-advised to include more specific allegations concerning the nature of the Owner's claim.

was the component part out of which the loss arose. The answer depends upon the meaning of the insured's 'work' which obviously is determined by who the insured is.'' 408 N.E.2d at 1280. Because the insured was a general contractor, responsible for the entire house, the court found that exclusion (o) denied coverage for damage to the house. *See also Todd Shipyard Corp. v. Turbine Service, Inc.,* 674 F.2d 401 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *Western Employers Ins. Co. v. Arciero & Sons, Inc.,* 146 Cal.App.3d 1027, 194 Cal.Rptr. 688 (1983).

O'Neil argues, however, that exclusion VI(A)(2)(d)(iii), which excludes coverage only for "that particular part of any property" damaged by faulty workmanship, narrows the faulty workmanship exclusion so that it does not apply to damage to the entire garage caused by faulty workmanship by G & H Steel in its installation of the steel mesh. This type of argument has been rejected in some cases where the insured's work was performed on a small portion of something which was a self-contained unit. For instance, in *Vinsant Electrical Contractors v. Aetna Casualty & Surety Co.,* 530 S.W.2d 76 (Tenn.1975), the insured had contracted to install two circuit breakers in a switchboard. During the installation, one of the insured's workmen caused a short which burned and blew up the entire switchboard. The court held that the "particular part" of the property on which operations were performed was the entire switchboard rather than the particular area of the switchboard upon which the insured was contracted to install the circuit breakers. Similarly, in *Goldsberry Operating Co., Inc. v. Cassity,* 367 So.2d 133 (La.App.1979), the insured was hired to perforate ten feet of a large well, at a depth of 8,000 feet, with an explosive gun. While the gun was being lowered, it prematurely exploded at 6,900 feet. The court held that the "particular part" of the property referred to the entire well, not merely to the portion of the well at the 8,000 foot depth at which the work was to performed.

However, where the insured is responsible for assembling many components of a large structure, such as a building, courts have interpreted exclusion VI(A)(2)(d)(iii) so as to exclude coverage only for damage to the defective component itself, and not to damage to the remainder of the structure. The seminal case on this issue is *Blackfield v. Underwriters at Lloyd's, London,* 245 Cal.App.2d 271, 53 Cal.Rptr. 838 (1966), in which the insureds had been the builders and sellers of a tract of homes which had been damaged by the insured's defective construction of the foundations. The court interpreted a similar exclusion as applying only to those parts of a house which were defective.

> [The insurers] attempt to extend [the exclusion] to damage to the whole house, including the non-defective parts thereof, on the theory that it is property upon which the respondents had worked. This is an unreasonable interpretation of the provision. It only excludes damage to that 'particular part' or parts upon which the Assured has performed faulty work.... Moreover, if there is any ambiguity or uncertainty in this exclusionary provision, it should be resolved against the insurer.

245 Cal.App.2d at 275–76, 53 Cal.Rptr. at 841. In *Baugh Construction Co. v. Mission Ins. Co.,* 836 F.2d 1164 (9th Cir.1988), the court agreed with *Blackfield* and held that a similar faulty workmanship exclusion did not exclude liability for damages to non-defective portions of the insured's work, i.e., "damages *unrelated* to the actual cost of repairing or replacing the defective part of the product." 836 F.2d at 1172 (emphasis in original).

In *Frankel v. J. Watson Co., Inc.,* 21 Mass.App. 43, 484 N.E.2d 104 (1985), the insured had been hired "to move a farmhouse to an alternate site, to construct a roadway to the new site, to install underground utilities and a new septic system, and to pour and construct a new concrete foundation." 484 N.E.2d at 104. The insured apparently performed all of the work itself. The owner made a claim against the insured alleging that damage to the farmhouse resulted from the insured's negligent construction of the foundation. Constru-

ing an exclusion identical to the exclusion at issue in this case, the *Frankel* court concluded that the exclusion affected only the foundation itself and did not exclude coverage for damages to the remainder of the property. Because *Frankel* involved an insured which performed all of the work itself, rather than arranging for performance by subcontractors, the instant case presents an even stronger case than *Frankel* for limiting the exclusion to the defective component itself.

This Court finds these authorities persuasive and holds that the literal language of the exclusion limits the exclusion to the cost of repairing or replacing the defective component itself, and not to damages to the remainder of the structure. Even if the exclusion were ambiguous, however, the Court would follow the principle that exclusions are to be interpreted narrowly against the insurer, and reach the same result.

## C. *Completed Operations*

O'Neil further argues that it has alleged sufficient facts to make applicable the policy's completed operations exclusion rather than the faulty workmanship exclusion. It argues that the faulty workmanship exclusion does not apply at all if the garage was a "completed operation" prior to the occurrence. Rather, the applicable exclusion, if any, would be exclusion VI(A)(3), which excludes coverage:

> with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations", to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.

As O'Neil correctly points out, the completed operations exclusion does not exclude coverage where the damage results from the work of a subcontractor rather than the work of the insured itself. *See Fireguard Sprinkler Systems, Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648 (9th Cir.1988); *Mid–United Contractors, Inc. v. Prov-*

*idence Lloyd's Ins. Co.*, 754 S.W.2d 824 (Tex.App.1988). National Union's only response to this argument is that the narrowing of an exclusion does not in itself constitute a grant of coverage, and that the loss must still be analyzed pursuant to the remainder of the policy. National Union states that "[i]n this regard, National Union has raised exclusion (m) in its [state court] declaratory judgment action and that exclusion would remove from the policy certain Loss of Use claims" (Reply Mem. at 27.) However, National Union has made no argument concerning Exclusion (m) in this Court and does not present any argument as to why the loss would be excluded if the garage had become a completed operation by the time of the occurrence.

The Court agrees that if O'Neil is able to present sufficient evidence that the garage constituted a completed operation, the policy would not exclude coverage for the loss. This provides an alternative ground for rejecting National Union's argument that the faulty workmanship clause mandates dismissal of Count I.

## D. *Condition Precedent*

National Union next argues that Count I must be dismissed because, as a matter of law, O'Neil did not comply with a condition precedent of the policy, which requires the insured to give the insurer prompt notice of an occurrence. Whether notice has been given within a reasonable time generally depends upon all of the facts and circumstances. *Sonoco Buildings, Inc. v. American Home Assurance Co.*, 877 F.2d 1350, 1356 (7th Cir.1989); *Casualty Indemnity Exchange v. Village of Crete*, 731 F.2d 457, 458 (7th Cir.1984). However, "if there are no disputed material facts, the court may in appropriate circumstances decide the issue of reasonable notice as a matter of law." *Casualty Indemnity*, 731 F.2d at 458. National Union argues that the facts as alleged in the complaint constitute inadequate notice as a matter of law. According to the complaint, O'Neil first gave notice to National Union some sixteen months after the cracking began and at least fourteen months after

O'Neil became aware of the cracking. Unexcused delays ranging from six months to two and a half years after an occurrence have been held unreasonable as a matter of law. *Id.* at 459 (collecting cases).

Because the reasonableness of notice depends on the facts and circumstances, the Court is hesitant to dismiss the complaint on this ground. "Although pleading the performance of conditions precedent is necessary to state a cause of action for breach of contract, Fed.R.Civ.P. 9(c) permits a plaintiff to aver generally that all conditions precedent have been performed or have occurred." *Redfield v. Continental Casualty Corp.*, 818 F.2d 596, 610 (7th Cir.1987) (citation omitted). In this case, O'Neil alleges that it "has performed all of its obligations as an insured under the Policy." (Complaint ¶ 47.)

There are too many unknown circumstances to warrant a finding at this stage regarding reasonableness of notice. For example, if National Union had received timely actual notice of the occurrence, such actual notice might satisfy the policy's notice requirement. *Id.* at 458. Furthermore, National Union has not alleged that it suffered any prejudice because of the lack of timely notice, and the Court's reading of the complaint reveals no likely prejudice suffered by National Union. However, although lack of prejudice may be a factor in determining whether there has been reasonable notice, it is not in itself a defense in the absence of an excuse for the delay. *Id.* at 459. O'Neil has alleged no excuse for delay, but has argued that it gave notice to National Union less than four weeks after it received a formal claim from the Owner. The policy, however, requires notice of an occurrence, not notice of a claim. It is unclear at this stage exactly when an "occurrence" took place—whether it was when the cracking was first noticed, when it became sufficiently severe as to make an awareness of a claim likely, or at some other time. Furthermore, O'Neil has raised the issue of whether National Union's participation in settlement negotiations for over six months after O'Neil notified National Union of the claim constituted a waiver of the notice requirement. *See*

*Muntwyler v. Ranger Ins. Co.*, 393 F.Supp. 795 (N.D.Ill.1975). *See also Sonoco*, 877 F.2d at 1355–57. The Court is unable and unwilling to resolve these issues in the context of a motion to dismiss the complaint when the factual circumstances are undeveloped. National Union's motion to dismiss Count I is denied.

## V. BAD FAITH DENIAL OF INSURANCE COVERAGE

In Count II, O'Neil seeks compensatory and punitive damages based on National Union's bad faith denial of insurance coverage. National Union argues that Count II should be dismissed because the tort of that denial of coverage has been preempted by Section 155 of the Illinois Insurance Code, Ill.Rev.Stat. ch. 73 ¶ 767, and because, even assuming that it has not been preempted, the facts alleged by O'Neil do not state a claim under this tort.

### A. *Preemption*

Section 155(1) of the Illinois Insurance Code provides:

Attorney Fees. (1) In any action by or against a company wherein there is at issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs of the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such parties entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

State and federal courts in Illinois have arrived at a number of different conclusions with respect to the issue of whether § 155 preempts the common law tort claim based on an insurer's bad faith denial of coverage. The short answer, however, in this case is that § 155 preempts, at most, common law actions predicated on an insurer's failure to pay a claim by the insured for a loss suffered by the insured itself. It does not preempt common law actions based on unreasonable refusals to settle a third party's claim against the insured. *See National Union Fire Ins. Co. v. Continental Illinois Corp.*, 673 F.Supp. 267, 271 (N.D.Ill.1987) (Shadur, J.). *See also Ranger Ins. Co. v. Home Indemnity Co.*, 714 F.Supp. 956, (N.D.Ill.1989) (Aspen, J.); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F.Supp. 955, 957–58 (N.D.Ill.1988) (Conlon, J.). Thus O'Neil's claim for compensatory and punitive damages in tort based on National Union's alleged failure to contribute to a settlement is not preempted.

■ Insofar as O'Neil's bad faith tort claim seeks compensatory damages, an alternative ground for the Court's holding that the claim is not preempted is its opinion in *Chicago HMO v. TransPacific Life Ins. Co.*, 622 F.Supp. 489 (N.D.Ill.1985) (Rovner, J.), that § 155 preempts common law tort claims for punitive damages but not claims for compenstory damages. Section 155's preemptive effect has been the subject of continuing disagreement. A number of cases have held that § 155 preempts claims for both compensatory and punitive damages. *See Impex Shrimp & Fish Co. v. Aetna Casualty & Surety Co.*, 686 F.Supp. 183 (N.D.Ill.1985) (Grady, J.); *Zakarian v. Prudential Ins. Co.*, 626 F.Supp. 420, 422 (N.D.Ill.1984) (Grady, J.); *Aabye v. Security–Connecticut Life Ins. Co.*, 586 F.Supp. 5 (N.D.Ill.1984) (Aspen, J.); *Abbott Laboratories v. Granite State Ins. Co.*, 573 F.Supp. 193 (N.D.Ill.1983) (Shadur, J.); *Shaw v. Equitable Life Assurance Soc.*, No. 82 C 1421, 1982 WL 1460 (Oct. 29, 1982) (Getzendanner, J.); *Henke v. Travelers Ins. Co.*, No. 80 C 5068 (N.D.Ill. Oct. 21, 1981) (Moran, J.); *Kinney v. St. Paul Mercury Ins. Co.*, 120 Ill.App.3d 294, 458 N.E.2d 79, 75 Ill.Dec. 911 (1st Dist.

1983); *Debolt v. Mutual of Omaha*, 56 Ill.App.3d 111, 371 N.E.2d 373, 13 Ill.Dec. 656 (3d Dist.1978); *Tobolt v. Allstate Ins. Co.*, 75 Ill.App.3d 57, 70, 393 N.E.2d 1171, 1181, 30 Ill.Dec. 824, 834 (1st Dist.1979); *Hamilton v. Safeway Ins. Co.*, 104 Ill. App.3d 353, 432 N.E.2d 996, 60 Ill.Dec. 97 (1st Dist.1982). A few cases have held that § 155 does not preempt tort claims for either compensatory or punitive damages. *See Roberts v. Western–Southern Life Ins. Co.*, 568 F.Supp. 536 (N.D.Ill.1983) (Marshall, J.); *Allianz Underwriters, Inc. v. Rusty Jones, Inc.*, No. 84 C 10860, 1985 WL 2272 (Aug. 6, 1985) (Holderman, J.). An increasing number of cases, including three decisions by judges who had previously held that all claims are preempted, have held that § 155 preempts claims for punitive damages but does not preempt claims for compensatory damages. *See Chicago HMO, supra*, 622 F.Supp. 489; *Langendorf v. Travelers State Ins. Co.*, 625 F.Supp. 1103, 1107–08 (N.D.Ill.1985) (Getzendanner, J.); *American Dental Ass'n v. Hartford Steam Boiler Inspection and Ins. Co.*, 625 F.Supp. 364, 367–69 (N.D.Ill.1985) (Plunkett, J.); *Scheinfeld v. American Family Mutual Ins. Co.*, 624 F.Supp. 698, 701–03 (N.D.Ill.1985) (Getzendanner, J.); *Barr Co. v. Safeco Ins. Co.*, 583 F.Supp. 248, 255–56 (N.D.Ill.1984) (Moran, J.); *Raprager v. Allstate Ins. Co.*, 183 Ill.App.3d 847, 539 N.E.2d 787, 132 Ill.Dec. 224 (2d Dist.1989); *Kohlmeier v. Shelter Ins. Co.*, 170 Ill.App.3d 643, 656–57, 525 N.E.2d 94, 104, 121 Ill.Dec. 288, 298 (5th Dist.1988); *McCall v. Health Care Service Corp.*, 117 Ill.App.3d 107, 452 N.E.2d 893, 72 Ill.Dec. 640 (4th Dist.1983); *Hoffman v. Allstate Ins. Co.*, 85 Ill.App.3d 631, 407 N.E.2d 156, 40 Ill.Dec. 925 (2d Dist.1980). *Cf. Lynch v. Mid–America Fire & Marine Ins. Co.*, 94 Ill.App.3d 21, 418 N.E.2d 421, 49 Ill.Dec. 567 (4th Dist. 1981) (superceded version of § 155 did not preempt claim for compensatory damages).

In 1988, the Seventh Circuit touched on this issue in *Kush v. American States Ins. Co.*, 853 F.2d 1380 (7th Cir.1988). The court noted that the First and the Third District Illinois Appellate Courts had held

that § 155 preempted tort claims based on an implied duty of good faith fair dealing, and it noted a possible split with other districts. 853 F.2d at 1385. The court did not, however, distinguish between compensatory and punitive damages or discuss the cases recognizing such a distinction. Furthermore, the *Kush* court was not faced with a claim for bad faith denial of coverage, but rather with a claim for intentional infliction of emotional distress. Relying on *Combs v. Insurance Co.*, 146 Ill.App.3d 957, 497 N.E.2d 503, 100 Ill.Dec. 525 (1st Dist.1986), the court held that the tort of intentional infliction of emotional distress was preempted by § 155. *Id.* The court also cited, in support, *Langendorf, supra,* where the district court had held that § 155 preempted actions for intentional infliction of emotional distress but did not preempt actions for compensatory damages based on a bad faith denial of coverage.

Judge Moran has concluded that *Kush* effectively overturned the line of cases in which district courts have held that § 155 does not preempt claims for compensatory damage. *See Barr Co. v. Safeco Ins. Co.,* 706 F.Supp. 616 (N.D.Ill.1989) (Moran, J.). This Court disagrees. First, the Seventh Circuit appeared to recognize a distinction between the torts of bad faith denial of coverage and intentional infliction of emotional distress; it recognized a split with respect to the former tort, which it did not resolve, and relied instead on precedents with respect to the latter tort, including *Langendorf,* which held that the preemptive effect differed with respect to the two torts. Second, the Seventh Circuit did not even address the differences between compensatory and punitive damages or the case law which held that the preemptive effect differed with respect to the two types of claims. Third, *Kush* was apparently decided without the benefit of *Raprager, supra,* and apparently without the benefit of *Kohlmeier, supra,* which was decided shortly before the decision in *Kush.* These decisions reflect an increasing acceptance in Illinois appellate courts of the argument that compensatory damages are not preempted by § 155. The Court finds, therefore, that *Kush* has not

effectively overturned *Chicago HMO* and other cases which hold that § 155 preempts claims for punitive damages but not claims for compensatory damages. Accordingly, even assuming that losses based on an insurer's denial of coverage with respect to a third party's claim against an insured were covered by § 155, the Court would hold that the insured's claim for compensatory damages is not preempted.

### B. *Adequacy of Allegations*

 National Union argues that O'Neil's allegations in Count II fail to state a claim for two independent reasons. First, National Union contends that the tort of bad faith denial of insurance coverage does not allow recovery for an insured which is a commercial entity securing business insurance. In support of this proposition, National Union cites *Impex, supra,* 686 F.Supp. at 186. *Impex* reached this decision on the basis that nothing in the seminal case recognizing this tort, *Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.,* 29 Ill.App.3d 339, 330 N.E.2d 540 (5th Dist.1975), *rev'd on other grounds,* 64 Ill.2d 338, 356 N.E.2d 75, 1 Ill.Dec. 75 (1976), "supports an expansion of its holding to business-insurance relationships." 686 F.Supp. at 186. This Court finds no basis for denying such a distinction. Certainly *Ledingham* does not draw distinctions between different classes of plaintiffs. Furthermore, other cases recognizing the existence of this tort have involved commercial business plaintiffs. *See, e.g., Verlan, supra,* 695 F.Supp. 955; *National Union, supra,* 673 F.Supp. 267; *American Dental Ass'n, supra,* 625 F.Supp. 364; *Chicago HMO, supra,* 622 F.Supp. 489; *Barr, supra,* 583 F.Supp. 248.

 Second, National Union argues, in its reply brief only, that O'Neil has failed to state a cause of action because it has not alleged that National Union knew that it was fully liable on the insurance contract. The Court initially notes that this argument was raised for the first time in defendant's reply brief, and that it does not directly respond to any argument raised in O'Neil's brief. On this basis, the Court

need not consider the argument at all. However, the Court also finds that the argument fails on its merits. Although *Langendorf, supra,* holds that an element of the tort is that "the insurer must have known it was liable on the contract but nonetheless refused to pay," 625 F.Supp. at 1108, the cases which it cites for this proposition, *U.N.R. Industries, Inc. v. Continental Ins. Co.,* 607 F.Supp. 855 (N.D.Ill.1984) and *Barr, supra,* 583 F.Supp. at 259, are merely examples where such an allegation was made; those cases do not support an argument that such an allegation is essential in all instances. Without deciding whether such an allegation is always necessary, this Court finds that the allegations in O'Neil's complaint are sufficient in describing the insurer's state of mind. Thus, the complaint alleges, for example, that National Union acknowledged that the claim was in fact covered by the policy, never raised any defense of lack of notice or any other defense besides the date of the occurrence, and continued to deny coverage even after plaintiff demonstrated that the date of the occurrence was within the period covered by the policy. Accordingly, the Court denies National Union's motion to dismiss Count II for failure to state a claim.

## VI. CONSUMER FRAUD

In Count III, O'Neil alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½ ¶¶ 261 *et seq.* Defendant raises three grounds in support of its motion to dismiss this count.

First, National Union argues that the complaint does not make the necessary allegation that there was fraud at the time of the sale of the insurance policy. On the contrary, Count III clearly alleges that National Union concealed from O'Neil a practice of avoiding prompt and complete payment of claims which it knew were due and owing and of delaying acknowledgment or denial of insurance coverage and improperly denying coverage for valid claims. National Union's first argument is therefore without merit.

Second, National Union argues that O'Neil is not a "consumer" for purposes of the Consumer Fraud Act. The Act defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for sale in the ordinary course of his trade or business but for his use or that of a member of his household." Ill.Rev.Stat. ch. 121½ ¶ 261(e). The Act further defines "person" as "any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association ..." Ill.Rev.Stat. ch. 121½ ¶ 261(c). The Act thus specifically applies to business corporations such as O'Neil. *See Continental Grain Co. v. Pullman Standard, Inc.,* 690 F.Supp. 628, 633 (N.D. Ill.1988) (Leinenweber, J.); *Impex Shrimp & Fish Co. v. Aetna Casualty & Surety Co.,* 686 F.Supp. 183, 186 (N.D.Ill.1985) (Grady, J.); *First Comics, Inc. v. World Color Press, Inc.,* 672 F.Supp. 1064, 1067 (N.D.Ill.1987) (Duff, J.); *Jays Foods, Inc. v. Frito–Lay, Inc.,* 664 F.Supp. 364, 368 (N.D.Ill.1987) (Moran, J.), *aff'd without opinion,* 860 F.2d 1082 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1125, 103 L.Ed.2d 188 (1989).

In support of its argument to the contrary, National Union cites *National Union Fire Ins. Co. v. Continental Illinois Corp.,* 652 F.Supp. 858 (N.D.Ill.1986) (Shadur, J.) and *Huss v. Goldman, Sachs & Co.,* 635 F.Supp. 1227 (N.D.Ill.1986) (Shadur, J.). *Huss* does not address the issue of who constitutes a "consumer," but merely cites *Newman–Green, Inc. v. Alfonzo–Larrain R.,* 590 F.Supp. 1083, 1085–88 (N.D.Ill.1984) (Shadur, J.) (discussed below), for the proposition that one-on-one misrepresentations and omissions are not covered by the Act. In *National Union,* Judge Shadur rejected a consumer fraud claim on two grounds. First, he held that plaintiff was not a "consumer" because it was a beneficiary, rather than the purchaser, of an insurance policy. That ground is inapplicable in the instant case. Second, relying on *Newman–Green, supra,* Judge Shadur held that the consumer fraud claim was defective because "it strains normal language usage to speak of an individual commercial purchaser ... in a one on one

(that is, separately negotiated) transaction as somehow being a 'consumer'." 652 F.Supp. at 861. The basis for this holding appears to be not that plaintiff was a business and not therefore a "consumer," but rather that plaintiff's allegations did not satisfy the "public injury" requirement which *Newman–Green* described and which this Court rejects as explained below. Thus neither of the cases cited by National Union in support of its argument that a commercial business is not a consumer stands for such a proposition, and the Court rejects defendant's argument.

▆▆▆ Third, National Union argues that plaintiff has not made the necessary allegation of a public injury or of injury to consumers generally. There is a split in the case law on the issue of whether such a requirement exists. Cases finding such a requirement include *Refco, Inc. v. Troika Vestment Limited,* 702 F.Supp. 684, 690 (N.D.Ill.1988) (Shadur, J.) (Act is intended to reach practices of type which affect consumers generally and is not an additional remedy to redress a purely private wrong); *First Comics, supra,* 672 F.Supp. 1064 (when the suit involves a private dispute between two businessmen, consumer injury is required); *Maduff v. Life Ins. Co.,* 657 F.Supp. 437, 440 (N.D.Ill.1987) (Bua, J.) (requiring allegation of a public injury or defect on consumer generally); *Newman–Green, supra,* 590 F.Supp. at 1087 ("plaintiff must show defendant has engaged in deceptive practices in promoting its goods or services to its market in general"); *Century Universal Enterprises, Inc. v. Triana Development Corp.,* 158 Ill.App.3d 182, 199, 510 N.E.2d 1260, 1269–70, 110 Ill.Dec. 229, 238–39 (2d Dist.1987) (agreeing with *Newman–Green* ); *Frahm v. Urkovich,* 113 Ill.App.3d 580, 586, 447 N.E.2d 1007, 1011, 69 Ill.Dec. 572, 576 (1st Dist.1983) (the Act is intended to reach practices which affect consumers generally and is not available as additional remedy to redress purely private wrong); *Exchange National Bank v. Farm Bureau Life Ins. Co.,* 108 Ill.App.3d 212, 215, 438 N.E.2d 1247, 1250, 63 Ill.Dec. 884, 887 (the Act "does not apply to every situation where ... the only actual controversy is whether

an isolated breach of contract occurred;" complaint must allege that the practices are "part of a pattern" of defendant's activities) (3d Dist.1982).

Cases finding no such requirement, or that no such allegation is required where the plaintiff was itself the consumer (rather than, for instance, a competitor) include: *Hometown Savings & Loan Ass'n v. Mosely Securities Corp.,* 703 F.Supp. 723, 726–27 (N.D.Ill.1988) (Norgle, J.) ("no public injury or effect on consumers is necessary to bring an action within the purview of the Act"); *Impex, supra,* 686 F.Supp. at 187 ("as long as the plaintiff, whether a business entity or a person, is a consumer, it need only show personal injury caused by the fraudulent or deceptive acts"); *Jays Foods, supra,* 664 F.Supp. at 368–69 (where a suit is between competitors, plaintiff must show injury to consumers generally, but where plaintiff is itself a consumer, further public injury may not need to be shown); *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 647 F.Supp. 1026, 1034–35 (N.D.Ill.1986) (Decker, J.) (no public injury required); *Barr, supra,* 583 F.Supp. at 258 ("insurance contracts are matters of public policy, and misrepresentations made with regard to such contracts would be the type covered by the Act"); *In re CLDC Mgmt. Corp.,* 18 B.R. 797, 800 (Bankr.N.D. Ill.1982); *Warren v. LeMay,* 142 Ill.App.3d 550, 567–68, 491 N.E.2d 464, 474–75, 96 Ill.Dec. 418, 428–29 (5th Dist.1986) (a single transaction is sufficient to establish a claim under the Act, citing cases); *Duncavage v. Allen,* 147 Ill.App.3d 88, 497 N.E.2d 433, 441, 100 Ill.Dec. 455, 463 (1st Dist.1986); *Tague v. Molitor Motor Co.,* 139 Ill.App.3d 313, 316, 487 N.E.2d 436, 437–38, 93 Ill. Dec. 769, 770–71 (5th Dist.1985); *M & W Gear Co. v. A W Dynamometer, Inc.,* 97 Ill.App.3d 904, 913–14, 424 N.E.2d 356, 365, 53 Ill.Dec. 721, 732 (4th Dist.1981).

This Court agrees with, and adopts, the reasoning of those cases which hold that no public injury or effect on consumers generally is required, at least in circumstances where the plaintiff itself is a consumer. Furthermore, even if there is such a public injury or effect on consumers requirement,

O'Neil has met this requirement. O'Neil alleges that National Union has (1) "engaged in a practice of avoiding prompt and complete payment of claims which they knew were due and owing National Union insureds;" (2) "engaged in a practice of delaying acknowledgment or denial of insurance coverage and improperly denying coverage for valid claims as a means of forcing insureds to accept less coverage than National Union actually owed under its policies;" and (3) "misled O'Neil and other insureds into believing that National Union would promptly and fully defend and indemnify them for any covered loss within policy limits." Substantially similar allegations were held in *Barr, supra,* 583 F.Supp. at 257–58, to constitute "more than an isolated breach of contract" and thus to remove the claim from the public injury line of cases.

The Court having rejected each of National Union's three arguments with respect to Count III, the motion to dismiss that count is denied.

### VII. CONCLUSION

For the reasons described above, National Union's motion to dismiss the complaint is denied.

### MEMORANDUM OPINION AND ORDER

The following addendum is hereby added to the Court's opinion of August 31, 1989 in this case:

In Part VI of this Opinion, the Court held that a plaintiff need not plead an injury to consumers generally in order to state a claim for violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act. On September 19, 1989, the Seventh Circuit Court of Appeals decided *First Comics, Inc. v. World Color Press, Inc.,* 884 F.2d 1033 which held in the context of an antitrust suit under the Robinson–Patman Act that the Illinois Consumer Fraud and Deceptive Trade Practices Act does require proof of injury to consumers generally. Although the facts of *First Comics* are different from those in this case, the principle announced by the Seventh Circuit is broad enough on its face to apply to this case. However broad *First Comics* may reach, however, it does not affect the result in this case because the Court in this case also found that plaintiff has complied with any requirement that it allege injury to consumers generally.